******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

EVELEIGH, J., concurring. Vengeance has no place in the orderly administration of justice by a civilized society. It certainly can never serve as the justification for the death penalty in today's world. My review of the text and legislative history of the public act under consideration, No. 12-5 of the 2012 Public Acts (P.A. 12-5), leads me to the inescapable conclusion that vengeance was the motivating factor underlying the enactment of the provisions allowing the eleven men on death row to be executed while eliminating the death penalty for crimes committed in the future. Because I conclude that there is no longer any valid penological purpose justifying the retention of the death penalty for prerepeal defendants, and that our capital sentencing statutory scheme no longer guards against arbitrariness, it necessarily follows that the portions of P.A. 12-5 that allow the men on death row to be executed are violative of the federal and state constitutional bans against cruel and unusual punishment. See U.S. Const., amend. VIII; Conn. Const., art. I, §§ 8, 9.[1] I therefore join the majority's analysis in all respects, and join in remanding the case with direction to sentence the defendant, Eduardo Santiago, to a term of life imprisonment without the possibility of release. I write separately to express my view that, although our state constitution provides separate and distinct protections to the citizens of Connecticut and appropriately prohibits capital punishment, the protections afforded by the eighth amendment to the United States constitution and existing federal case law would have been sufficient to prohibit capital punishment in the state of Connecticut. Moreover, although I agree with the majority that capital punishment is unconstitutional and that the majority properly reached the issue of unconstitutionality, in view of the dissents' claims about the appropriateness of the majority's reaching the issue, I conclude that the unconstitutional aspects of the act could have been severed in order to effectuate the legislature's clear intent to repeal the death penalty.

Historically, Connecticut has been a leader in recognizing limits to the application of the death penalty.[2] The death penalty is an especially brutal, archaic punishment, and one that has been kept alive only because of our society's acceptance of the traditional theories of punishment, namely, retribution and deterrence. Because the concept of retributive justice inextricably links the severity of a punishment with the culpability of the offender, the death penalty must be available for similarly culpable offenders in order for a capital sentencing scheme to fulfill a valid retributive purpose. By maintaining the death penalty for those who have committed a capital offense before the act's arbitrary effective date while eliminating the death penalty for

any crime committed thereafter, no matter how heinous that crime may be, P.A. 12-5 severs the tie between the imposition of the death penalty and the culpability of the individual offender.

## I

### P.A. 12-5 RENDERS CONNECTICUT'S CAPITAL PUNISHMENT STATUTORY SCHEME UNCONSTITUTIONAL UNDER THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION

The eighth amendment to the constitution of the United States bans the infliction of all cruel and unusual punishments. See footnote 1 of this concurring opinion. In assessing the contours of the eighth amendment in the context of the death penalty, the United States Supreme Court has recognized that "the penalty of death differs from all other forms of criminal punishment, not in degree but in kind." (Internal quotation marks omitted.) *Solem* v. *Helm*, 463 U.S. 277, 289, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983), quoting *Furman* v. *Georgia*, 408 U.S. 238, 306, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (Stewart, J., concurring).

When a particular type of punishment is challenged categorically or, in other words, when it is argued that a given penalty is never appropriate for a specific category of offender, "[t]he [c]ourt first considers objective indicia of society's standards, as expressed in legislative enactments and state practice to determine whether there is a national consensus against the sentencing practice at issue. . . . Next, guided by the standards elaborated by controlling precedents and by the [c]ourt's own understanding and interpretation of the [e]ighth [a]mendment's text, history, meaning, and purpose . . . the [c]ourt must determine in the exercise of its own independent judgment whether the punishment in question violates the [c]onstitution." (Citations omitted; internal quotation marks omitted.) *Graham* v. *Florida*, 560 U.S. 48, 61, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010).

The Supreme Court also has recognized that, because of its ultimate and irrevocable effect, the death penalty cannot be imposed under procedures that create a substantial risk of its infliction in an arbitrary and capricious manner. See *Gregg* v. *Georgia*, 428 U.S. 153, 188, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976). Simply put, "[t]he [e]ighth and [f]ourteenth [a]mendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be . . . wantonly and . . . freakishly imposed." (Internal quotation marks omitted.) Id., quoting *Furman* v. *Georgia*, supra, 408 U.S. 310 (Stewart, J., concurring).

Following our legislature's prospective repeal of the death penalty, the single most determinative factor in

whether a death penalty is imposed or carried out under our capital sentencing scheme is the date on which a defendant commits his or her crime—specifically, whether a defendant has committed his or her crime before April 25, 2012. As I explain in part I A of this concurring opinion, I conclude that, as amended by P.A. 12-5, Connecticut's capital sentencing scheme is contrary to the consensus against executions postrepeal of the death penalty. In addition, as I explain in part I B of this concurring opinion, to allow such an arbitrary factor, which lacks any connection to the purported purposes of the death penalty and the nature of the offenses committed, to have such an extreme impact on the ultimate fate of a limited class of individual defendants is the paradigm of capriciousness that the eighth amendment will not tolerate.

### A

### Executing the Defendant Following the Repeal of the Death Penalty Is Inconsistent with Contemporary Standards of Decency

Under the test reserved for categorical challenges to the death penalty for a particular class of offender, the first step is to consider objective indicia of society's standards. *Graham* v. *Florida*, supra, 560 U.S. 61–62. In the present case, this step requires the court to examine the standards expressed by legislatures and courts regarding the imposition of the death penalty following a prospective repeal. Although "[t]he clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures"; (internal quotation marks omitted) id., 62, quoting *Atkins* v. *Virginia*, 536 U.S. 304, 312, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002); "[t]here are measures of consensus other than legislation. . . . Actual sentencing practices are an important part of the [c]ourt's inquiry into consensus." (Citation omitted; internal quotation marks omitted.) *Graham* v. *Florida*, supra, 62; accord *Kennedy* v. *Louisiana*, 554 U.S. 407, 433–34, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008); *Roper* v. *Simmons*, 543 U.S. 551, 573, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *Atkins* v. *Virginia*, supra, 316; *Thompson* v. *Oklahoma*, 487 U.S. 815, 821–29, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (1988); *Enmund* v. *Florida*, 458 U.S. 782, 794–96, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982). On the basis of not only the actions of legislative and executive branches worldwide regarding prospective repeals of the death penalty, but also the actual sentencing practices of other jurisdictions during periods of time in which the death penalty has been repealed, I would conclude that current societal standards unequivocally indicate an unwillingness to impose the death penalty on defendants who committed their crimes prior to the repeal.

### 1

### Federal and State Case Law

Although the United States Supreme Court has repeatedly upheld the facial validity of the death penalty; see *Gregg* v. *Georgia*, supra, 428 U.S. 187; in recent years, that court has limited the situations in which capital punishment is permissible. See *Kennedy* v. *Louisiana*, supra, 554 U.S. 413 (death penalty impermissible for nonhomicide crimes against individuals); *Roper* v. *Simmons*, supra, 543 U.S. 568 (death penalty impermissible for defendants who committed their crimes prior to age of eighteen); *Atkins* v. *Virginia*, supra, 536 U.S. 321 (death penalty impermissible for defendants whose intellectual functioning is in low range). That court, however, has never decided whether a state may carry out executions while a prospective repeal of the death penalty is in effect.

Nonetheless, this nation's highest court *has* considered the significance of a prospective repeal of the death penalty for purposes of eighth amendment analysis. In *Atkins* v. *Virginia*, supra, 536 U.S. 314–15, the United States Supreme Court determined that a national consensus existed against the execution of mentally disabled defendants, relying in part on the fact that eighteen of the thirty-eight states that permitted capital punishment had enacted legislation forbidding the execution of such individuals. See id., 342 (Scalia, J., dissenting). The court was well aware that, of those eighteen states, only seven had prohibited *all* such executions, while eleven had enacted statutes prospectively prohibiting the execution of mentally disabled individuals, thus maintaining death sentences for mentally disabled individuals who had committed capital offenses prior to the enactment of the repeals. See id., 342–43 (Scalia, J., dissenting) (arguing against inclusion of prospective repeal states). The court declined, however, to draw any analytic distinction between states that had completely abolished the execution of mentally disabled individuals and states that had only had prospectively prohibited it in determining whether a national consensus against the practice had emerged. Id., 314–16. Under *Atkins*, therefore, a prospective appeal of the death penalty signals a jurisdiction's own consensus against the death penalty.[3]

Applying the proper standard, I turn now to the practices of our sister states, as articulated by their legislatures and courts. As I explain in further detail subsequently in this opinion, twenty-seven other states and the District of Columbia have, at least at some point in history, eliminated their death penalty, and no executions have been carried out by those states as long as the repeal or invalidation remained in effect.[4] Eleven states other than Connecticut, namely, Hawaii, Illinois, Iowa, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, Vermont, and Wisconsin, have enacted repeals of the death penalty that are prospective only in nature.[5] Only one state other than Con-

necticut, New Mexico, continues to have individuals sentenced to death despite the enactment of a prospective repeal. See 2009 N.M. Laws 141. The appellate courts of that state have not yet ruled on the constitutionality of the prospective only nature of their repeal, and no executions have been carried out since its enactment.[6] Significantly, however, a small number of states have enacted prospective repeals of the death penalty for certain classes of offenders or prospective repeals of procedures that had made a death sentence more likely. In these states, courts consistently have concluded that the repeal must be applied to persons previously sentenced to death.[7]

I begin with the case law from those states that have addressed the question that is before this court in the context of a partial repeal of the death penalty or death penalty provisions. This case law shows that, like the view taken by the United States Supreme Court, a prospective repeal of the death penalty is deemed to signify consensus that the execution of individuals who fall within the category of offender affected by the prospective repeal, including those individuals sentenced to death prior to the repeal, would violate contemporary standards of decency. See *Fleming* v. *Zant*, 259 Ga. 687, 690, 386 S.E.2d 339 (1989), superseded by statute as stated in *Turpin* v. *Hill*, 269 Ga. 302, 303–304, 498 S.E.2d 52 (1998); *Saylor* v. *Indiana*, 808 N.E.2d 646, 650 (Ind. 2004); *Cooper* v. *State*, 540 N.E.2d 1216, 1220–21 (Ind. 1989); *State* v. *Bey*, 112 N.J. 45, 51, 548 A.2d 846 (1988); *Van Tran* v. *State*, 66 S.W.3d 790, 801–804 (Tenn. 2001). Thus, courts have vacated a defendant's death sentence when, due to prospective changes in that state's capital punishment scheme, the defendant would not have been eligible for the death penalty had he been sentenced after the statutory changes were made.

In *Cooper* v. *State*, supra, 540 N.E.2d 1220, the Indiana Supreme Court concluded that a prospective repeal of the death penalty for offenders under the age of sixteen rendered the prerepeal death sentence of a fifteen year old defendant unconstitutional under that state's constitution. In considering the Indiana legislature's decision to apply the repeal prospectively despite the fifteen year old defendant's pending death sentence, the court noted: "The bill's sponsors declared openly that this exclusion was purposeful. Although the exclusion [of the defendant] was assaulted on the [h]ouse floor during consideration of the bill as being unjust, it was apparent that the authors wished to enact a general policy without the passion that legislating on a particular case would arouse." (Footnotes omitted.) Id., 1219. The Indiana Supreme Court reasoned as follows in holding that executing the defendant would violate the state constitution:[8] "While this case has been pending on appeal, the legal landscape surrounding it has changed dramatically in ways that reflect on the appropriateness of this

death penalty 'in light of other death penalty cases.' " Id. Although the legislature purposefully had crafted the repeal so as not to affect the defendant's death sentence, the court did not find the effective date provision of the act dispositive of the issue of whether it was constitutional to execute the defendant. Id. Rather, the court stated: "Now that Indiana law establishes [sixteen] as the minimum age for the imposition of the death penalty, [the defendant] would be both the first and the last person ever to be executed in Indiana for a crime committed at the age of [fifteen]. This makes her sentence unique and disproportionate to any other sentence for the same crime." Id., 1219–20. This language, in my view, suggests that the court determined that the prospective repeal signified a societal consensus against the execution of any offender who was younger than sixteen years of age at the time of his or her crime, regardless of whether the crime was committed prior to the effective date of the repeal.

More recently, in *Saylor* v. *Indiana*, supra, 808 N.E.2d 651, the Indiana Supreme Court reduced a death sentence after a change in the law altered the way that the death penalty could be imposed in future cases. The defendant in *Saylor* had been sentenced to death in 1992, despite a unanimous jury recommendation to the contrary, under a law that allowed the trial judge to override a jury recommendation against death if the trial judge found that the statutory aggravating circumstances outweighed any mitigating circumstances. Id., 647–48. After the defendant's sentence was affirmed, the Indiana legislature enacted legislation that eliminated the trial judge's authority to impose a death sentence in contravention of a jury's recommendation. Id., 648. The defendant thereafter sought rehearing on the judgment affirming his sentence, claiming, inter alia, that his death sentence should be invalidated because, if his sentencing had occurred after the amendments to the capital sentencing statute took effect, he would not have been eligible for the death penalty. Id. On rehearing, the Indiana Supreme Court agreed with the defendant and reduced his sentence from death to a term of years. Id., 651. As it did in *Cooper*, the court reaffirmed its goal of ensuring " 'evenhanded operation of the death penalty statute' by reviewing death sentences 'in light of other death penalty cases.' " Id., 650. Although the court noted that it had previously affirmed the defendant's death sentence, it explained: "Since that time the legal landscape has significantly changed. . . . [A]s a matter of Indiana state law [the defendant], if tried today, could not be sentenced to death without a jury recommendation that death be imposed. Under these circumstances we conclude that his death sentence is inappropriate and should be revised." Id. The court compared the case before it with its previous decision in *Cooper*, and stated that both cases presented "situations in which the legislature, after [the defen-

dants'] sentences were imposed, *enacted significant changes in the requirements for the death penalty that would render* [*the defendants*] *ineligible for a death sentence in a trial conducted today.* . . . [*W*]*e conclude it is not appropriate to carry out a death sentence that was the product of a procedure that has since been revised in an important aspect that renders the defendant ineligible for the death penalty.*" (Emphasis added.) Id., 650–51. Accordingly, the Indiana Supreme Court converted the sentence of death to a term of imprisonment.

Similarly, in *Van Tran* v. *State*, supra, 66 S.W.3d 792, the Tennessee Supreme Court concluded that it would violate that state's constitutional ban on cruel and unusual punishment to execute a mentally disabled defendant after the enactment of laws prospectively banning such executions. That court concluded that, although the legislature did not intend for the repeal to apply retroactively to those mentally disabled defendants who had been sentenced to death prior to the effective date of the repeal; id., 798–99; the prospective ban nevertheless reflected an "evolving societal view" in that state that executing a mentally disabled individual would violate "contemporary standards of decency." Id., 801–805.

The Georgia Supreme Court reached the same conclusion when faced with a challenge to a statute prospectively repealing the death penalty for mentally disabled individuals. See *Fleming* v. *Zant*, supra, 259 Ga. 690. That court concluded that the prospective repeal signified that the contemporary " 'standard[s] of decency' " in that state no longer supported the execution of those individuals, including those who were on death row prior to the effective date of the repeal. Id. In analyzing the significance of the prospective repeal, the court stated: "The legislative enactment reflects a decision by the people of Georgia that the execution of mentally [disabled] offenders makes no measurable contribution to acceptable goals of punishment. Thus, although there may be no 'national consensus' against executing the mentally [disabled], this state's consensus is clear."[9] (Footnote omitted.) Id.

Likewise, in *State* v. *Bey*, supra, 112 N.J. 51, the New Jersey Supreme Court gave retroactive effect to a statute prospectively repealing the death penalty for crimes committed by minors. Although in that case the court premised its decision to apply the statute retroactively on rules of statutory construction; id., 100–105; it noted that, apart from the legislature's intent concerning retroactivity, "notions of fundamental fairness . . . would likewise demand retroactive application of the juvenile-offender exemption in this case. . . . Indeed, the [state] . . . concedes that sound public policy and fundamental fairness dictate that [the] defendant not be singled out to be the only juvenile ever executed or

even eligible for execution under our current death penalty law." (Citation omitted; internal quotation marks omitted.) Id., 104–105.

It is all but a certainty that at least some future offenders protected by the prospective repeal will have the *same characteristics* as the prerepeal defendants, and that their crimes will be similar to—if not worse than—those committed by the prerepeal defendants, yet only the prerepeal defendants would face the possibility of dying at the hands of the state. As I explain more fully in part I A 3 of this concurring opinion, first, it would be irrational to conclude that the prerepeal defendants may be executed when the legislature has determined that the death penalty should not be available for all future offenders, irrespective of whether their moral culpability is similar to, or greater than, that of the prerepeal defendants. Second, these decisions from our sister states were not all solely grounded on the fact that the legislative enactments addressed offenders who, in general, are less culpable than the average adult offender, and that this diminished culpability rendered imposition of the death penalty unconstitutional. Rather, these decisions aptly highlighted the fundamental unfairness inherent in executing a defendant when, due to a legislative enactment either prospectively repealing the death penalty or substantially altering the way in which the death penalty may be imposed in the future, that defendant would not have been eligible for the death penalty if he or she had been sentenced after the enactment took effect.[10] Thus, these courts were also concerned with ensuring the evenhanded operation of their capital sentencing statutes, and viewed the date of an offense as an arbitrary eligibility factor for the death penalty.[11] See *Saylor* v. *Indiana*, supra, 808 N.E.2d 650; *Cooper* v. *State*, supra, 540 N.E.2d 1219; *State* v. *Bey*, supra, 112 N.J. 104–105. Thus, the precedents of our sister states, in my view, weigh strongly against carrying out an execution after the legislature has prospectively repealed the death penalty.

2

Actual Practices in Other Jurisdictions

Moreover, in assessing whether a punishment is constitutionally sound, "it also is appropriate for us to consider what is occurring in actual practice." *State* v. *Rizzo*, 303 Conn. 71, 191, 31 A.3d 1094 (2011), cert. denied,    U.S.    , 133 S. Ct. 133, 184 L. Ed. 2d 64 (2012). Thus, in determining whether there is a national consensus against conducting executions while a death penalty repeal is in place, it is proper to look to the number of executions that have occurred in other states while a repeal of the death penalty has been in effect. See *Graham* v. *Florida*, supra, 560 U.S. 63–64 (reviewing statistics concerning number of juvenile nonhomicide offenders serving sentences of life imprisonment without possibility of parole); *Kennedy* v. *Loui-*

*siana*, supra, 554 U.S. 433–34 (reviewing statistics about number of executions of child rapists to determine if such punishment is socially unacceptable); *State* v. *Rizzo*, supra, 191–93 (reviewing number of people on death row and number of executions carried out nationally to constitutionality of death penalty).

Upon review, it does not appear that any state has ever executed an inmate while a death penalty repeal has been in force.[12] Aside from the two states with expressly prospective death penalty repeals, Connecticut and New Mexico; see footnote 6 of this concurring opinion; seventeen states, as well as the District of Columbia, do not have statutes that currently authorize the death penalty. See Death Penalty Information Center, "States With and Without the Death Penalty," (2015), available at http://www.deathpenaltyinfo.org/states-and-without-death-penalty (last visited August 10, 2015). In two of these states—North Dakota and West Virginia—the legislation repealing the death penalty expressly stated that the repeal applied retroactively.[13] In six of these states—Hawaii, Illinois, Iowa, Maryland, Minnesota and New Jersey—the death sentences of the remaining inmates on death row were commuted by the executive branch, either before or after the legislature repealed the death penalty.[14] In two other states—Massachusetts and New York—as well as the District of Columbia, a court invalidated the existing death penalty statutory scheme, which effectively banned future executions in the absence of a statutory change.[15] No such changes have been made. Thus, no postrepeal executions have taken place in the nineteen other jurisdictions which currently prohibit the death penalty.

In addition, the following thirteen states have, at various times in our nation's history, temporarily repealed and later reinstated the death penalty, yet none of these states ever executed a person previously sentenced to death while the temporary repeal remained in effect: Arizona,[16] Colorado,[17] Delaware,[18] Iowa,[19] Kansas,[20] Maine,[21] Missouri,[22] New Mexico,[23] New York,[24] Oregon—twice,[25] South Dakota,[26] Tennessee,[27] and Washington.[28] No state has executed an inmate while a repeal was in effect.[29] Rather, any executions occurred after the death penalty was reinstated and a new death sentence was imposed under the new capital sentencing statute. On several occasions, the sentences of prerepeal death row inmates were commuted to life imprisonment through applicable procedures.[30] In other instances, the repeal legislation either expressly[31] or impliedly[32] applied retroactively.[33]

The utter absence of postrepeal executions leads me inexorably to the conclusion that there is a national consensus against the practice. In fact, the statistics in this case are far more convincing than some of the statistics relied upon by the United States Supreme

Court in determining that a national consensus exists against a given sentencing practice. See *Graham* v. *Florida*, supra, 560 U.S. 64–65 (concluding that there was national consensus against sentencing juvenile nonhomicide offenders to life imprisonment without possibility of parole when only 123 such people were serving that sentence in eleven jurisdictions); *Atkins* v. *Virginia*, supra, 536 U.S. 316 (concluding national consensus against executing intellectually disabled defendants existed where five such offenders had been executed in thirteen year period); *Enmund* v. *Florida*, supra, 458 U.S. 794 (concluding that society had rejected death penalty for nontriggerman felony murderers where only six such offenders had been executed between 1954 and 1982). Thus, although the United States Supreme Court has determined that a national consensus exists against the sentencing practices in those cases, despite the fact that those sentences had actually been imposed, there cannot be a clearer indicator of consensus than that demonstrated by the statistics in the present case, namely, a complete unwillingness on the part of this nation to impose or carry out a death sentence while a death penalty repeal—either prospectively or in toto—is in effect. The actual practice of these states is the controlling factor, and the practice of these states is, clearly, not to execute. See *Atkins* v. *Virginia*, supra, 316 (national consensus exists against executing mentally disabled individuals when, among others things, even states that *authorized* practice had not actually carried out such executions).

### 3

### International Considerations

Finally, I would point out that, not only is there a national consensus against the imposition of the death penalty while a repeal is in effect, there is a demonstrable *global* consensus that postrepeal executions are impermissible. According to a recent report by the United Nations, as of 2008, ninety-five countries have abolished the death penalty for all crimes.[34] U.N. Secretary-General, "Capital Punishment and Implementation of the Safeguards Guaranteeing Protection of the Rights of Those Facing the Death Penalty; Report of the Secretary-General," (2009), p. 7, available at http://www.crin.org/docs/UN_CP.pdf (last visited August 10, 2015). According to available data, none of these countries have ever executed an individual after the death penalty was repealed, regardless of whether the repeal was accomplished via legislation, executive action, or a determination by a court of law. Id., pp. 60–62; see also Death Penalty Information Center, "Abolitionist and Retentionist Countries," (2015), available at http://www.deathpenaltyinfo.org/abolitionist-and-retentionist-countries (last visited August 10, 2015).

Thus, if Connecticut were to execute the defendant

after the enactment of P.A. 12-5, it would apparently earn the dubious distinction of becoming the first sovereign entity to execute one of its citizens while a repeal of the death penalty remains in force. In doing so, our state would distinguish itself from a host of countries that have refused to tread the path on which our state now travels, including countries as varied as Argentina, Belgium, Cambodia, Djibouti, France, Haiti, Ireland, Kyrgyzstan, Mexico, Mozambique, the Philippines, Romania, Rwanda, Samoa, Senegal, Serbia, South Africa, Turkey, and the United Kingdom. U.N. Secretary-General, supra, pp. 60–62.

In light of the foregoing, I am persuaded that there are clear objective indicia of societal standards supporting the proposition that there is a consensus that the imposition of a sentence of death following a legislative repeal of the death penalty violates contemporary standards of decency.

B

Enactment of P.A. 12-5 Eliminates Any Valid
Penological Objective for Maintaining the
Death Penalty for Prerepeal Offenders
for Reasons Unrelated to
Their Culpability

"Community consensus, while entitled to great weight, is not itself determinative of whether a punishment is cruel and unusual." (Internal quotation marks omitted.) *Graham* v. *Florida*, supra, 560 U.S. 67. "In accordance with the constitutional design, the task of interpreting the [e]ighth [a]mendment remains our responsibility. . . . The judicial exercise of independent judgment requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question. . . . In this inquiry the [c]ourt also considers whether the challenged sentencing practice serves legitimate penological goals." (Citations omitted; internal quotation marks omitted.) Id.

In *Roper* v. *Simmons*, supra, 543 U.S. 568–71, *Graham* v. *Florida*, supra, 560 U.S. 67–71, and *Miller* v. *Alabama*, U.S. , 132 S. Ct. 2455, 2465–69, 183 L. Ed. 2d 407 (2012), the United States Supreme Court contrasted the characteristics of juveniles and adults who committed the same criminal behavior, and concluded that juveniles were less culpable than adults who commit the same crime and, therefore, the punishment at issue—whether it was life without parole or the death penalty—would be cruel and unusual if imposed on a juvenile even though the same sentence would not violate the eighth amendment when imposed on an adult. In *Atkins* v. *Virginia*, supra, 536 U.S. 317–18, the court engaged in a similar analysis regarding adults with intellectual disabilities.

In cases such as *Coker* v. *Georgia*, 433 U.S. 584, 592,

97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977) (plurality opinion), *Enmund* v. *Florida*, supra, 458 U.S. 787, and *Kennedy* v. *Louisiana*, supra, 554 U.S. 438–39, the Supreme Court examined whether imposition of the death penalty for a nonhomicide crime violated the eighth amendment. In each case, the court concluded that the imposition of the death penalty would be unconstitutionally disproportionate to the culpability of the offender. See, e.g., *Kennedy* v. *Louisiana*, supra, 438. In reaching its conclusion, the court examined not only societal consensus regarding the punishment faced by the defendant and the underlying penological justifications, but also the characteristics of the crime and the offender.

The present case raises an issue that has not been answered by any of the previously cited cases. The defendant asks us to decide whether the imposition of the death penalty would be disproportionate in relation to the particular type of homicide of which he was convicted as to violate the eighth amendment now that our legislature has determined that, moving forward, the death penalty is an impermissible punishment for *any* offender who commits the same type of homicide. This is fundamentally a different question than the ones posed by *Enmund, Kennedy, Coker, Simmons, Atkins, Graham,* and *Miller.* In each of those cases, the court was essentially being asked to make an exception—to spare a group of offenders from an otherwise acceptable penalty. By contrast, in the present case, we are faced with the situation in which Connecticut has determined that the death penalty is no longer an acceptable punishment for *any* crime committed today. Thus, the question is not whether Connecticut may create an exception to an otherwise acceptable punishment, but whether Connecticut may inflict an otherwise unacceptable punishment on the defendant.

An exploration of P.A. 12-5 and how it would impact offenders such as the defendant helps put the question before us in proper context. Public Act 12-5, § 2, amended General Statutes § 53a-35a, effective April 25, 2012. That statute presently provides in relevant part: "For any felony committed on or after July 1, 1981, the sentence of imprisonment shall be a definite sentence and, unless the section of the general statutes that defines or provides the penalty for the crime specifically provides otherwise, the term shall be fixed by the court as follows: (1) (A) For a capital felony committed prior to April 25, 2012, under the provisions of section 53a-54b in effect prior to April 25, 2012, a term of life imprisonment without the possibility of release unless a sentence of death is imposed in accordance with section 53a-46a, or (B) for the class A felony of murder with special circumstances committed on or after April 25, 2012, under the provisions of section 53a-54b in effect on or after April 25, 2012, a term of life imprisonment without the possibility of release . . . ." General Statutes § 53a-35a. The most significant feature of this

scheme for purposes of this part of my analysis is that the conduct classified as a "capital felony" or a "murder with special circumstances" *is exactly the same.* The legislature simply substituted the term "murder with special circumstances" for "capital felony" in the provision setting forth the eight offenses that were previously eligible for capital punishment. Compare General Statutes (Rev. to 1999) § 53a-54b ("[a] person is guilty of a capital felony who is convicted of . . . [2] murder committed by a defendant who is hired to commit the same for pecuniary gain or murder committed by one who is hired by the defendant to commit the same for pecuniary gain"), with General Statutes (Rev. to 2013) § 53a-54b ("[a] person is guilty of murder with special circumstances who is convicted of any of the following . . . [2] murder committed by a defendant who is hired to commit the same for pecuniary gain or murder committed by one who is hired by the defendant to commit the same for pecuniary gain"). Only the former version of the statute, however, permits punishment by death. Thus, the precise conduct which gave rise to the defendant's capital felony conviction is now defined as "murder with special circumstances . . . ." If the defendant had engaged in identical conduct after April 25, 2012, the death penalty simply would not have been an available punishment. Therefore, the date of the offense, rather than the particular culpability of the offender, is determinative of whether the death penalty is available. With this perspective in mind, I turn to the question of whether such a dichotomy can be justified.

Under the eighth amendment, in order for a punishment to pass constitutional muster, it must fulfill a valid penological objective. "Criminal punishment can have different goals, and choosing among them is within a legislature's discretion." *Graham* v. *Florida*, supra, 560 U.S. 71. The two penological justifications traditionally and consistently articulated in support of the death penalty are deterrence of capital crimes and retribution. See *Kennedy* v. *Louisiana*, supra, 554 U.S. 441. Unless the imposition of the death penalty "*measurably* contributes to one or both of these goals, it is nothing more than the purposeless and needless imposition of pain and suffering, and hence an unconstitutional punishment." (Emphasis added; internal quotation marks omitted.) *Atkins* v. *Virginia*, supra, 536 U.S. 319. Although this court has previously concluded that the death penalty validly serves one or both of these objectives; see *State* v. *Rizzo*, supra, 303 Conn. 197–98; it is plain to me that, in light of the prospective repeal, the execution of prerepeal death row inmates no longer measurably contributes to a valid penological objective.

There has been a long running debate as to whether the death penalty actually functions as a deterrent to those crimes deemed capital offenses. See, e.g., J. Acker, "Be Careful What You Ask For: Lessons From New York's Recent Experience With Capital Punish-

ment," 32 Vt. L. Rev. 683, 702–11 (2008). Courts have concluded that "[t]he value of capital punishment as a deterrent of crime is a complex factual issue the resolution of which properly rests with the legislatures, which can evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts." *Gregg* v. *Georgia*, supra, 428 U.S. 186; see also *State* v. *Rizzo*, supra, 303 Conn. 197. Thus, courts have deferred to a legislative judgment that "the possible penalty of death may well enter into the cold calculus that precedes the decision to act." *Gregg* v. *Georgia*, supra, 186.

Deferring to our legislature is not proper in the present case. Public Act 12-5 eliminates the possibility that any future murderer will be sentenced to death. The potential infliction of the penalty of death, therefore, will no longer enter into an individual's decision of whether to commit murder with special circumstances. Thus, "[f]ollowing the abolition of the death penalty for all future offenses committed in Connecticut . . . it is possible to determine the *exact* number of potential crimes that will be deterred by executing the defendant in this case. That number is zero." (Emphasis in original.) *State* v. *Santiago*, 305 Conn. 101, 321, 49 A.3d 566 (2012) (*Harper*, *J.*, concurring in part and dissenting in part). Accordingly, the execution of the defendant, as well as the executions of the other inmates who remain on death row, cannot be justified by its deterrent effect.[35] See *Atkins* v. *Virginia*, supra, 536 U.S. 319–20 (concluding that executing mentally retarded will not further goal of deterrence).

Courts have always treated death differently from other types of punishments in determining what is constitutionally permissible. See *Solem* v. *Helm*, supra, 463 U.S. 289; *Bullington* v. *Missouri*, 451 U.S. 430, 445–46, 101 S. Ct. 1852, 68 L. Ed. 2d 270 (1981); *Beck* v. *Alabama*, 447 U.S. 625, 637–38, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980); *Gardner* v. *Florida*, 430 U.S. 349, 358–60, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977). No court has ever justified the continued imposition of the death penalty on minors or the mentally disabled following repeal because doing so would have promoted stability in the law. The prospective repeal of the death penalty in this statute has eliminated the traditionally articulated rationale of deterring those particularly heinous crimes deemed to justify the punishment of death.

Therefore, I turn to the other claimed justification for capital punishment, namely, retribution. Although not a forbidden penological objective, "[r]etribution is no longer the dominant objective of the criminal law . . . ." (Citations omitted; internal quotation marks omitted.) *Gregg* v. *Georgia*, supra, 428 U.S. 183; see also *State* v. *Corchado*, 200 Conn. 453, 463, 512 A.2d 183 (1986). The United States Supreme Court has recognized that, of the valid justifications for punishment,

"retribution . . . most often can contradict the law's own ends. This is of particular concern when the [c]ourt interprets the meaning of the [e]ighth [a]mendment in capital cases. When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint." *Kennedy* v. *Louisiana*, supra, 554 U.S. 420.

"[T]he heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender." (Internal quotation marks omitted.) *Graham* v. *Florida*, supra, 560 U.S. 71; see also *Atkins* v. *Virginia*, supra, 536 U.S. 319 ("[w]ith respect to retribution . . . the severity of the appropriate punishment necessarily depends on the culpability of the offender"). Retribution is committed to general principles mandating similar punishment in similar circumstances. See R. Nozick, Philosophical Explanations (1981) p. 367. Thus, retribution "sets an internal limit to the amount of punishment, according to the seriousness of the wrong . . . ." Id. Retributive justice, therefore, is concerned with imposing a sentence proportionate to the crime, so that the "interest in seeing that the offender gets his 'just deserts' " is satisfied. *Atkins* v. *Virginia*, supra, 319; see also *Kennedy* v. *Louisiana*, supra, 554 U.S. 442 ("[t]he goal of retribution . . . reflects society's and the victim's interests in seeing that the offender is repaid for the hurt he caused").

Under this theory, it is unjust to create a system that purposefully imposes, or encourages the imposition of, wholly disproportionate punishment on equally culpable defendants. Rather, to fulfill a valid retributive purpose, sentences must be handed out evenhandedly; legislatures and courts cannot simply dole out different punishments, varying not merely in degrees of severity, but in kind, for similar crimes. Indeed, the notion that the death penalty should be reserved for only the most deserving of offenders and, thus, work to produce evenhanded justice, is embedded in this nation's capital punishment jurisprudence. To ensure that only the most culpable of offenders are sentenced to death, the United States Supreme Court has "consistently confined the imposition of the death penalty to a narrow category of the most serious crimes." *Atkins* v. *Virginia*, supra, 536 U.S. 319; see also *Kennedy* v. *Louisiana*, supra, 554 U.S. 442 ("[i]n considering whether retribution is served . . . we have looked to whether . . . the culpability of the prisoner is so serious that the ultimate penalty must be sought and imposed" [internal quotation marks omitted]). The death penalty, therefore, has been reserved for certain crimes "so grievous an affront to humanity that *the only adequate response may be the penalty of death.*" (Emphasis added.) *Gregg* v. *Georgia*, supra, 428 U.S. 184.

In written testimony to the Judiciary Committee,

Chief State's Attorney Kevin Kane acknowledged that "[p]rospective repeal of the death penalty will create two classes of people: one will be subject to execution and the other will not, not because of the nature of the crime or the existence or absence of any aggravating or mitigating factor, but because of the date on which the crime was committed." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., p. 2937. In so doing, however, our legislature's prospective repeal necessarily establishes that the death penalty is not the only adequate response to those crimes previously deemed capital felonies.

What, then, is the real purpose behind executing the men currently on death row, when the legislature has completely taken death off of the table for all crimes committed after April 25, 2012? Although P.A. 12-5 contains no statement of policy or underlying findings, the legislative history establishes two factors that indicate that maintaining the death penalty on the basis of an arbitrary date does not measurably contribute to a valid retributive purpose. First, the various rationales articulated in support of the death penalty's repeal applied to all cases regardless of the date of offense: (1) the death penalty operates in an incurably arbitrary and discriminatory manner;[36] (2) the risk of executing an innocent person cannot be eliminated;[37] (3) the length of time required for effective appellate and postconviction review would make it more likely that the men on death row would die of old age rather than be executed;[38] (4) the death penalty fails to provide closure for victims' families;[39] and, of course, (5) moral objections to the state's taking of a life.[40] Second, although the legislative debate articulated serious concerns as to the legal and moral propriety of prospective repeal,[41] no lawmaker articulated a legitimate or moral rationale for conditioning death upon the date of the offense. The lone comment expressing anything close to such a justification was a suggestion that the state should not upset the expectations of victims' families, a point that I address subsequently in this concurring opinion. See 55 S. Proc., Pt. 3, 2012 Sess., p. 720, remarks of Senator Andrew Roraback. No other legislator indicated that he or she shared that particular view. Rather, it was broadly acknowledged that the decision to repeal the death penalty only on a prospective basis was driven by a desire to exact revenge on certain notorious death row inmates and the fear of the political consequences that could have accompanied an absolute prohibition.[42] For example, Representative Lawrence Cafero, an opponent of the prospective nature of the repeal and the abolition of the death penalty generally, stated: "It is no secret that what is weighing over all of us is the [murder of Jennifer Hawke-Petit, Hayley Petit, and Michaela Petit in Cheshire]. In fact, it was widely reported that one of the reasons this General Assembly didn't take this bill up earlier was because of the fresh-

ness of those awful crimes." 55 H.R. Proc., Pt. 3, 2012 Sess., p. 1043; see also 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1063, remarks of Representative Al Adinolfi ("[t]here are many people in this room that have changed in their mind their vote to abolish the death penalty rather than vote against abolishing the death penalty based on these [eleven] who are on death row being executed, especially [Joshua] Komisarjevsky and [Steven] Hayes [who were convicted of capital felonies in connection with the murders in Cheshire]");[43] 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1305, remarks of Representative Ernest Hewett ("for the members who are voting for a prospective bill so they can make sure that Hayes and Komisarjevsky get the death penalty, it's not going to happen"). Representative Cafero later added that, if the legislature intended to have a debate about the propriety of the death penalty, "let's have that debate. Let's not have this one. Let's not mislead the public. . . . If it is the will of this [c]hamber that this [s]tate is no longer in the business of executing people, then let's say it and do it. You cannot have it both ways." 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1047. Likewise, Representative Themis Klarides, herself a supporter of the death penalty, remarked about the inconsistency inherent in the legislative determination that a select few individuals may be executed, but that execution is unjustified in any circumstance going forward: "I do not get how anybody can say, I believe killing is wrong. . . . What I don't get is, how killing can be wrong for someone else, but [the men currently on death row], they are bad, so we can kill them. . . . You either support the death penalty and taking somebody's life or you don't." Id., p. 1210. These are, obviously, statements selected from an extremely extensive legislative history. Nevertheless, these statements, in my view, accurately reflect the primary reasons behind the prospective nature of the repeal: the desire to see the men currently on death row die, or at least certain of them,[44] as well as the avoidance of the political consequences that would have accompanied the abolishment of existing death sentences.

Therefore, I can only conclude that the purpose of limiting the repeal of the death penalty prospectively is private vengeance. Private vengeance differs markedly from retribution, and is an impermissible justification for punishment. Whereas retribution is concerned with ensuring that an offender gets his " 'just deserts' "; *Atkins* v. *Virginia*, supra, 536 U.S. 319; revenge,[45] on the other hand, is personal, or private. A person or society seeking revenge has a personal tie to the victim, or is personally affected by the harm done to the victim. Those seeking revenge are motivated by emotion, and take personal pleasure in the suffering of the offender. See R. Nozick, supra, p. 367. Most significantly, revenge, by its nature, carries no limits on the harm that may be imposed on the offender, whereas retribution sets an

internal limit on punishment according to an offender's culpability. See id. Thus, revenge cares not with what comes of other offenders who commit similar crimes, but is concerned only with harming a specific offender.[46]

The state contends, however, that executing prerepeal death row inmates does serve a valid retributive purpose because, by carrying out existing death sentences, the state will fulfill promises it has made to the victims of these crimes and, particularly, their families. I cannot agree. Although the office of the state's attorney may have the ability to promise a victim's family that it will seek a sentence of death, it cannot legitimately promise that the offender will be put to death for numerous reasons. The jury may decide not to convict or not to impose a sentence of death. Should the jury vote to impose that punishment, the defendant's death sentence may be vacated on direct appeal, as in the present case, or in collateral proceedings even years later. The board of parole and pardons could commute the death sentence. See General Statutes § 54-124a (d). More fundamentally, selectively executing the men currently on death row in order to fulfill such promises would amount to nothing more than exacting revenge on behalf of the families of the victims.

Simply because society demands a certain punishment does not mean that the state is authorized to carry it out. "The mere fact that the community demands the murderer's life in return for the evil he has done cannot sustain the death penalty, for . . . 'the [e]ighth [a]mendment demands more than that a challenged punishment be acceptable to contemporary society.' " *Gregg* v. *Georgia*, supra, 428 U.S. 240 (Marshall, J., dissenting). "It is undoubtedly correct that there is a demand for vengeance on the part of many persons in a community against one who is convicted of a particularly offensive act. At times a cry is heard that morality requires vengeance to evidence society's abhorrence of the act. But the [e]ighth [a]mendment is our insulation from our baser selves. The 'cruel and unusual' language limits the avenues through which vengeance can be channeled. Were this not so, the language would be empty and a return to the rack and other tortures would be possible in a given case." (Footnote omitted.) *Furman* v. *Georgia*, supra, 408 U.S. 344–45 (Marshall, J., concurring).

Thus, society's desire to see the men on death row executed cannot alone legitimize executing the prerepeal defendants in light of the death penalty repeal. See *State* v. *Santiago*, supra, 305 Conn. 319 (*Harper, J.,* concurring in part and dissenting in part) ("[i]f it is upon . . . rage that the death penalty depends, then that penalty cannot stand"). Indeed, it is wholly inconsistent to justify an execution by *our society's* moral outrage at the offender's conduct when our state no longer sanctions a sentence of death for any crime

committed today. I therefore conclude that the retention of the death penalty for the men currently on death row, after the legislature has declared that the death penalty is no longer a proper punishment for any murderer going forward, serves no valid penological purpose, and marks this state's "sudden descent into brutality, transgressing the constitutional commitment to decency and restraint."[47] *Kennedy* v. *Louisiana*, supra, 554 U.S. 420.

In light of the foregoing principles, I therefore conclude that the execution of prerepeal death row inmates while a death penalty repeal is in effect does not measurably contribute to a valid retributive purpose. Public Act 12-5 ensures that no murderer will be sentenced to death in the future, irrespective of his or her culpability. Thus, the act completely unravels the thread that links the imposition of the death penalty and the culpability of individual offenders. No longer can death be imposed for crimes virtually identical to, similar to, or even more heinous than the crimes committed by prerepeal death row inmates. By repealing the death penalty going forward, the legislature has made a determination that the internal limit of punishment, or the most appropriate penalty, for even the most egregious of crimes is life imprisonment without the possibility of parole. In other words, the legislature has rejected the notion that death is the only adequate response for even the most culpable of offenders; see *Gregg* v. *Georgia*, supra, 428 U.S. 184; and, instead, has determined that a sentence of life imprisonment without the possibility of parole will suffice to satisfy the interest in seeing that such an offender gets his just deserts.

C

Applying the Death Penalty on the Basis of the Date of
the Offense in Relation to the Effective Date
of P.A. 12-5 is Unconstitutionally Arbitrary

It is also my view that, as amended by P.A. 12-5, Connecticut's statutory capital sentencing scheme is unconstitutional because, as currently structured, it suffers from the same inequities that plagued the capital sentencing schemes that were declared unconstitutional by the United States Supreme Court in *Furman*. See *Furman* v. *Georgia*, supra, 408 U.S. 238–40. In *Furman*, a majority of United States Supreme Court justices each came to the independent conclusion that the penalty of death, as it was then currently administered, was so cruel and unusual as to violate the eighth amendment. Id., 240. Although no justice's reasoning could command a clear majority, by examining the decision in *Furman* in light of two other cases decided in that time period by the United States Supreme Court, namely, *McGautha* v. *California*, 402 U.S. 183, 91 S. Ct. 1454, 28 L. Ed. 2d 711 (1971), and *Gregg* v. *Georgia*, supra, 428 U.S. 153, one comes to understand that the death penalty is in accord with the eighth amendment

*only* when it is imposed on the most culpable offenders for the commission of the most grave homicides and, importantly, *only* when this most extreme punishment is imposed fairly, consistently, and based solely on the individual and unique circumstances of each case. What Connecticut has done, by prospectively repealing the death penalty for all types of homicide that previously were defined as "capital felonies" by §§ 53a-35a and 53a-54b, is to remove any assurance that only the most deserving offenders will be selected by our statutory scheme to receive the death penalty on the basis of their individual circumstances.

The United States Supreme Court decision in *McGautha* reveals the problems that occurred under the older versions of our nation's capital sentencing schemes. In *McGautha*, two men who had been sentenced to death claimed that "the absence of standards to guide the jury's discretion on the punishment issue is constitutionally intolerable. . . . [The] petitioners contend that to leave the jury completely at large to impose or withhold the death penalty as it sees fit is fundamentally lawless and therefore violates the basic command of the [f]ourteenth [a]mendment that no [s]tate shall deprive a person of his life without due process of law." *McGautha* v. *California*, supra, 402 U.S. 196. At that point in time, the United States Supreme Court was unwilling to recognize the unconstitutionality of the outdated sentencing schemes that permitted juries to exercise unchanneled discretion in determining a capital defendant's sentence. See id., 203–208.

The United States Supreme Court would reverse course only one year later in *Furman*. In that case, five justices separately concluded that the death penalty as currently administered was unconstitutional under the eighth and fourteenth amendments. *Furman* v. *Georgia*, supra, 408 U.S. 238–40. Justice Stewart's opinion, which focused on the random and arbitrary manner in which the death penalty was imposed, heavily influenced the development of modern capital sentencing schemes. Id., 309–10. More than anything else, Justice Stewart was concerned with the unprincipled manner in which the death penalty was being imposed at the time: "These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of . . . murders in 1967 and 1968, *many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed.*" (Emphasis added; footnote omitted.) Id. Thus, although Justice Stewart did not determine that the death penalty itself is a violation of the eighth amendment; see id., 307–308; one can only conclude that whenever randomness, arbitrariness, or capriciousness exert their influence on the imposition of the death penalty, the eighth and fourteenth amendments of the constitution of the United

States have been violated.

The plurality opinion in *Gregg* serves as a guide to legislatures that wish to continue to constitutionally impose the death penalty. In *Gregg*, the United States Supreme Court approved of a Georgia capital sentencing statute passed in response to *Furman*: "The basic concern of *Furman* centered on those defendants who were being condemned to death capriciously and arbitrarily. Under the procedures before the [c]ourt in that case, sentencing authorities were not directed to give attention to the nature or circumstances of the crime committed or to the character or record of the defendant. Left unguided, juries imposed the death sentence in a way that could only be called freakish. The new Georgia sentencing procedures, by contrast, focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant. . . . In this way the jury's discretion is channeled. No longer can a jury wantonly and freakishly impose the death sentence; it is always circumscribed by the legislative guidelines." *Gregg* v. *Georgia*, supra, 428 U.S. 206–207.[48]

Public Act 12-5 amends Connecticut's statutory death penalty scheme in a manner that, in my view, runs afoul of the principles expressed in *Furman*. The United States Supreme Court has repeatedly found that death is different. "There is no question that death as a punishment is unique in its severity and irrevocability." Id., 187; see also *Furman* v. *Georgia*, supra, 408 U.S. 305 (Brennan, J., concurring) ("death is an unusually severe and degrading punishment"); *Furman* v. *Georgia*, supra, 346 (Marshall, J., concurring) (death is "the ultimate sanction"). It cannot fairly be denied that "death is a punishment different from all other sanctions in kind rather than degree." *Woodson* v. *North Carolina*, 428 U.S. 280, 303–304, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976). "When a defendant's life is at stake, the [United States Supreme Court] has been particularly sensitive to insure that every safeguard is observed. . . . It is an extreme sanction, suitable to the most extreme of crimes." (Citations omitted; footnote omitted.) *Gregg* v. *Georgia*, supra, 428 U.S. 187.

Instead of resulting from the unfettered discretion of a jury, as in *Furman*, the arbitrariness in the present case stems from the effective date provision of the act, which, in effect, renders the date on which a defendant commits his crime an eligibility factor for the death penalty. I fail to see how this scheme, which permits the imposition of the death penalty for a capital felony committed at any time prior to 11:59 p.m. on April 24, 2012, but rejects categorically the imposition of the death penalty for the same conduct or even substantially more heinous acts carried out two minutes later, is in any way distinct from the constitutionally infirm schemes rejected by the United States Supreme Court

in *Furman*. The circumstances that I describe strike me as exactly the sort of wanton and freakish imposition of the death penalty that runs afoul of the eighth amendment of the United States constitution. See *Furman* v. *Georgia*, supra, 408 U.S. 310 (Stewart, J., concurring); *Callins* v. *Collins*, 510 U.S. 1141, 1152, 114 S. Ct. 1127, 127 L. Ed. 2d 435 (1994) (Blackmun, J., dissenting from denial of certiorari) ("[t]he demands of *Furman* are met by 'narrowing' the class of death-eligible offenders *according to objective, fact-bound characteristics of the defendant or the circumstances of the offense*" [emphasis added]).

In my view, the understanding that, today, only this subset of criminal offenders—those defendants who committed capital felonies prior to the effective date of P.A. 12-5, regardless of individual culpability—will be subject to this punishment causes an arbitrary, anomalous impact on this subset of criminal offenders and therefore causes Connecticut's capital sentencing scheme as amended by P.A. 12-5 to violate the eighth amendment.

## II

### SEVERABILITY OF UNCONSTITUTIONAL PARTS OF P.A. 12-5

Having concluded that the execution of prerepeal death row inmates violates the constitutional ban on cruel and unusual punishment, and although the majority opinion decides today that capital punishment is unconstitutional, in view of the dissents' claims about the appropriateness of the majority's reaching the issue, I now examine the effect that this conclusion has on the continued viability of P.A. 12-5. My conclusion as to the constitutionality of the act relates solely to the effective date provision of the act, which is the mechanism by which the death penalty is retained for capital felonies committed before the act and abolished for all identical future crimes.[49] The issue, therefore, is whether the unconstitutional provisions are severable from the remainder of the act. I would conclude that they are and, thus, would allow the constitutional portions of the act to stand—namely, those portions that effectuate the repeal of the death penalty.

In determining the appropriate remedy when a portion of a statute has been found to be unconstitutional, "[w]e seek to determine what [the legislature] would have intended in light of the [c]ourt's constitutional holding. . . . Thus, [g]uiding the solution is the maxim that this court will strive to interpret a statute so as to sustain its validity . . . and [to] give effect to the intention of the legislature. . . . [In enacting] General Statutes § 1-3 the legislature has shown its intention that there is to be a presumption of separability of the provisions and of the applications of statutes. . . . With regard to the separability of provisions, to overcome

the presumption it must be shown that the portion declared invalid is so mutually connected and dependent on the remainder of the statute as to indicate an intent that they should stand or fall together . . . and this interdependence would warrant a belief that the legislature would not have adopted the remainder of the statute independently of the invalid portion. . . .

"[U]pon finding a portion of a statute to be unconstitutional, this court does not ask whether, if the legislature had known about the constitutional flaw at the time of enactment, it might have preferred some other form of legislation over the remaining constitutional portion of the statute, a question that might well engage the court in speculation. Rather, this court asks the much narrower question of whether the legislature, at the time that the statute is invalidated, would prefer the continued operation of the constitutional portion of the statute or the complete invalidation of the statute." (Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Bell*, 303 Conn. 246, 260–61, 33 A.3d 167 (2011). Moreover, I acknowledge that, "even with the presumption of divisibility, we cannot rewrite a statute and give it an effect altogether different from that sought by the measure viewed as a whole especially where offending portions so affect the dominant aim of the whole statute as to carry [the whole statute] down with them." (Internal quotation marks omitted.) *In re Robert H.*, 199 Conn. 693, 704, 509 A.2d 475 (1986), quoting *Railroad Retirement Board* v. *Alton Railroad Co.*, 295 U.S. 330, 362, 55 S. Ct. 758, 79 L. Ed. 1468 (1935).

In attempting to discern the legislature's intent regarding the severability of a statute, this court generally looks to the level of interdependence between the unoffending language and the unconstitutional language of the statute, and seeks to determine whether, if the unconstitutional portion is excised, the remainder still gives effect to the "dominant aim of the whole statute . . . ." (Internal quotation marks omitted.) *In re Robert H.*, supra, 199 Conn. 704. Thus, the analysis does not involve speculation as to how the legislature would have voted had it been aware of the court's constitutional ruling, but rather whether the language chosen by the legislature renders the statute inseverable. For example, in *State* v. *Menillo*, 171 Conn. 141, 368 A.2d 136 (1976), this court examined the severability of language contained in General Statutes (Rev. to 1975) § 53-29, which criminalized behavior intended to induce a miscarriage or abortion of a pregnancy. In an earlier decision concerning the same statute, the court concluded that the entirety of the statute was unconstitutional in light of the decisions of the United States Supreme Court in *Roe* v. *Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973), and *Doe* v. *Bolton*, 410 U.S. 179, 93 S. Ct. 739, 35 L. Ed. 2d 201 (1973), which upheld a woman's right to an abortion by medically competent

personnel. See *State* v. *Menillo*, 168 Conn. 266, 269, 362 A.2d 962 (1975). The United States Supreme Court subsequently vacated this court's decision holding the statute unconstitutional in its entirety, and concluded that neither its decision in *Roe* nor *Doe* mandated the total invalidation of the statute. See *Connecticut* v. *Menillo*, 423 U.S. 9, 96 S. Ct. 170, 46 L. Ed. 2d 152 (1975). On remand, this court reconsidered its earlier decision, and sought to determine whether the language of § 53-29 could be limited to exclude physicians from its operation, and thus ensure a woman's right to an abortion by medically competent personnel. *State* v. *Menillo*, supra, 171 Conn. 145. With the foregoing principles on severability in mind, this court concluded that "[t]he exclusion of physicians from the prohibitions of the statute would in no way destroy its effectiveness as to other classes of persons. The invalid inclusion of physicians is not so mutually related to and intrinsically connected with the remainder of the statute as to indicate that the statute would never have been adopted without the inclusion of physicians." Id., 146. Thus, the court concluded that the presumption of severability was not overcome, and that the legislature intended to criminalize the covered behavior when engaged in by a person who was not a physician.

Similarly, in *In re Robert H.*, supra, 199 Conn. 693, this court examined statutory language to discern the legislature's dominant purpose in enacting the statute. The defendants in that case had been adjudicated delinquents and committed to state custody after being charged with sexual assault. Id., 695. At trial, the defendants sought to introduce records from the rape crisis center visited by the victim, but the court granted a motion to quash the subpoena because of General Statutes (Rev. to 1985) § 52-146k, which, inter alia, created a testimonial privilege for communications between a sexual assault counselor and a sexual assault victim. Id., 698. The defendants appealed an order by the trial court quashing a subpoena for records from the rape crisis center visited by the victim based on a determination that information contained therein was privileged. Id., 694–701. Specifically, the defendants claimed that the statutory privilege created by § 52-146k was improperly invoked because other language prevented the identity of the sexual assault counselor from being disclosed in a civil or criminal proceeding; General Statutes (Rev. to 1985) § 52-146k (b); and, thus, the definitional elements necessary to qualify an individual as a "sexual assault counselor," which determine whether the privilege applied under the statute, could not be established because the counselor could not be called to testify at trial. Id., 698–701; General Statutes (Rev. to 1985) § 52-146k (a) (5).

On appeal, this court agreed that the statute contained conflicting language, stating, "if the identity of the sexual assault counselor cannot be disclosed under

. . . § 52-146k (b), then it would always be impossible to determine whether the statutory criteria set out in § 52-146k (a) (5) were satisfied with respect to that sexual assault counselor." *In re Robert H.*, supra, 199 Conn. 701. After analyzing the language of the statute, the court concluded that "[t]he obvious intent and the dominant purpose of this statute is to grant a privilege to confidential communications between a sexual assault counselor . . . and a victim." Id., 703. Then, instead of striking down the entire statute, the court determined that the "portion of § 52-146k (b) which prohibits the disclosure of the identity of a sexual assault counselor is separable and independent from the balance of the statute given [the statute's] dominant purpose of creating the privilege . . . ." Id., 704. Accordingly, the court remanded the case to the trial court for a determination of whether the sexual assault counselor who treated the victim satisfied the necessary criteria to claim the testimonial privilege. Id., 704–705. The court similarly directed that the counselor's identity be disclosed to the defendants for purposes of cross-examination concerning her statutory qualifications. Id., 705.

Similarly, in *State* v. *Bell*, 283 Conn. 748, 784–86, 931 A.2d 198 (2007), this court was tasked with determining whether General Statutes (Rev. to 2007) § 53a-40 (h), violated the sixth amendment. The statutory subsection at issue authorized the trial court to impose a substantially harsher sentence on a defendant if: (1) a jury had determined he qualified as a persistent dangerous felony offender *and*; (2) the trial court concluded that the public interest would be best served by subjecting the defendant to a harsher sentence. See id., 796. Although in that case, the court did look to the legislative history to determine the actual intent of the legislature in amending the statute at issue; see id., 802–803, 812; the court ultimately concluded that, as worded, the statute did violate the sixth amendment because it authorized a sentence enhancement greater than the maximum sentence authorized by the jury verdict. Id., 803–804. Instead of striking the statute in its entirety, however, the court noted that if a phrase were excised from the statute, it would be rendered constitutional while still keeping with the legislature's dominant purpose behind enacting the statute. See id., 811–12. The court did so even though its separation had the effect of altering the legislature's chosen process required for a persistent dangerous felony offender to receive an enhanced sentence. See id., 811–13.

With the foregoing principles in mind, I would conclude that the statute in the present case is separable.[50] As in *In re Robert H.*, the statutory language in the present case evinces two separate legislative goals: the prohibition of the death penalty for all crimes committed after the effective date of P.A. 12-5; and the retention of the death sentences of the prerepeal defendants.[51] It would be anomalous and alarming to conclude that,

in enacting a statute repealing the death penalty, the legislature was primarily concerned with seeing a handful of men executed. Thus, it is clear to me that the dominant purpose of P.A. 12-5 was to prohibit the death penalty for future crimes. The retention of existing death sentences was incidental to the primary purpose of abolition. Indeed, if the obvious intent of the legislature was to retain the death penalty for prerepeal defendants, then why would the legislature have enacted the statute? Connecticut, after all, already authorized the death penalty prior to P.A. 12-5 and, therefore, legislative inaction would have ensured the retention of existing death sentences. Likewise, it is noteworthy that the abolition of the death penalty will affect all future defendants, an unquantifiable and obviously large number, whereas the portion of P.A. 12-5 retaining the death penalty for crimes committed prior to the effective date will affect only those defendants who have committed capital felonies prior to the effective date. Thus, striking down P.A. 12-5 in its entirety would thwart its primary purpose—the abolition of the death penalty.[52]

The state claims, however, that an examination of the legislative history of P.A. 12-5 shows that the legislature would not have repealed the death penalty without retaining preexisting death sentences and, therefore, that the statute is not severable. I disagree. In certain instances, when legislative intent is not readily apparent from the plain language of the statute, this court has examined the legislative history of a statute when determining whether a statute is severable. See *State* v. *Bell*, supra, 303 Conn. 261–63; *State* v. *Bell*, supra, 283 Conn. 802–803. Even if one examines the legislative history of the act, the state's argument lacks merit. This court does not seek to determine whether, if the legislature had known about the constitutional flaw at the time of enactment, it would have enacted the remaining constitutional portion of the statute, an exercise that would engage this court in speculation. See *State* v. *Bell*, supra, 303 Conn. 261. Rather, the question this court must answer is whether the legislature, at the time that a portion of the statute is declared unconstitutional, would prefer the continued operation of the constitutional portion of the statute or the complete invalidation of the statute. Id. In answering this question, the court must keep in mind that there is a presumption in favor of severability. See General Statutes § 1-3. Moreover, this court should keep in mind that, if only a portion of a statute is found to be constitutional, it should be severed from the offending remainder "unless this court determines that the legislature would have enacted it in *precisely the same form* if it had known of the constitutional flaw at the time of enactment." (Emphasis in original.) *State* v. *Bell*, supra, 303 Conn. 261 n.12. As this court explained in *Bell*, this means that this court would have to find that the legislature would not have repealed the death penalty if it had

been aware of the constitutional flaw in P.A. 12-5. See id.

Although I consider the dominant purpose of the statute to be evident from its plain language, an examination of the relevant legislative history bolsters my conclusion that the offending portion of the statute is, in fact, severable from the constitutional remainder. Although the state points to select portions of the legislative history that highlight an insistence that the repeal be prospective,[53] there is also evidence that many legislators were in favor of a complete repeal of the death penalty. More importantly, the legislature was warned, in no uncertain terms, that an attempt to repeal the death penalty only prospectively was likely to run afoul of both the federal and state constitutions. Consider, for example, a portion of Chief State's Attorney Kevin Kane's testimony before the Judiciary Committee: "If it is passed in this form and it's prospective and a crime occurs the day before it becomes effective my feeling is [that] there's—I know I wouldn't, I know I won't seek the death penalty for a crime that occurs the day before it becomes effective. *I think that would be arbitrary.* And I wouldn't—just wouldn't plain feel right doing it. That's my opinion."[54] (Emphasis added.) Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., p. 2633. Asked point-blank by a legislator "does this law, this bill stop [offenders who committed capital felonies prior to the effective date] from receiving the death penalty?" Id., p. 2646. Chief State's Attorney Kane responded: "the wording of the bill itself does not *but my prediction is . . . that as a result of . . . this bill passing people won't be executed whether [they have] been sentenced or not.*" (Emphasis added.) Id.

Similarly, another legislator urged the House of Representatives to adopt an amendment to the bill that became P.A. 12-5 that would have reinstated the death penalty for all offenders if this court were to determine that the repeal of the death penalty was constitutionally required to apply to those currently sentenced to death: "This amendment, Madam Speaker . . . now is very appropriate. There are many people in this room that have changed in their mind their vote to abolish the death penalty rather than vote against abolishing the death penalty based on these [eleven] who are on death row being executed, especially, Komisarjevsky and Hayes . . . . And what I'm saying is that we will be misleading the people in this room that have changed their decision because the death penalty will still stay in place for those that are on death row if we do not pass this . . . amendment . . . we would be doing them a wrong. And I think those people would . . . have been misled by this coming out, because I believe that those who put in this bill, with the prospective in there, know that eventually this is going to go away, and they're misleading the rest of the [r]epresentatives that will be voting here today; therefore, I urge all my colleagues in this room to support this amendment." 55 H.R. Proc.,

Pt. 4, 2012 Sess., p. 1063, remarks of Representative Adinolfi. The amendment, which was described by its sponsor, Representative John Hetherington, as "the opposite of a severability clause . . . think of it that way"; id., p. 1061; failed by a vote of fifty-four to eighty-eight, with nine votes not present or abstaining. Id., p. 1066.

A matching amendment failed in the Senate. The amendment's sponsor explained the need for it as follows: "[T]he intent is—Senator [Eric] Coleman had indicated that the bill he believes not to be unconstitutional. Therefore this amendment does not have to go forward. And I guess I look at it as a spare tire in your trunk. You may not need it. But if it is unconstitutional, you have it. And you've protected the intent of the [l]egislature, which is not, clearly not to let the [eleven] currently on death row to get a different sentence. And *if that's clearly what we want to do this amendment will ensure that takes place*. And there's many of us around the [c]ircle who, at least I understand, were debating whether to vote in favor of getting rid of the death penalty or not. But clearly an effort to change their mind was the relief or satisfaction that the [eleven] who are currently on death row would continue to be on death row absent—even with this legislation. All this does is say absolutely true. And if your wishes are not upheld, and if those [eleven] end up with a lesser sentence, which was not our intent, we will do away with getting rid of the death penalty. It's just protection that gets what we all wanted. And if that's a major factor, this is how you protect it." (Emphasis added.) 55 S. Proc., Pt. 3, 2012 Sess., p. 668, remarks of Senator Leonard Fasano. This proposed amendment also failed to pass, receiving fifteen votes in favor and twenty against, with one vote not present or abstaining. Id., p. 669. All of the legislators who voted against this amendment were presumably aware of the statutory presumption codified at § 1-3 in favor of severing invalid provisions from the remaining inoffensive language of a statute at the time that they rejected these amendments. See, e.g., *State* v. *Fernando A.*, 294 Conn. 1, 21, 981 A.2d 427 (2009) ("the General Assembly is always presumed to know all the existing statutes and the effect that its action or non-action will have upon any one of them" [internal quotation marks omitted]).

Further, other legislators plainly believed that there might be constitutional issues associated with a purely prospective repeal: for example, Senator John Kissel stated the following in response to testimony that sought to assure the legislature that a prospective only repeal could be accomplished: "[T]his is Connecticut, this is New England, this is a debate that's not going away any time soon and I really do believe once this step is made, the other shoe's going to fall, inevitably, if not sooner than we all think. And whether it's driven by a Supreme Court decision, appeals, or whether a

future legislature a few years from now says, wow, we can't have [eleven] people on death row and have everybody else—or some horrible, horrific criminal commits a crime and because it's a few days after this goes into effect then the argument is we've got this individual here who can only face life without [the] possibility of release, that is fundamentally unfair to these other individuals and that's—that becomes much more difficult for folks such as myself who are advocates and proponents of the death penalty." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., p. 2768.

Accordingly, I conclude that the portions of P.A. 12-5 that render it unconstitutional are not so mutually connected to the constitutional remainder so as to indicate a legislative intent that the entire act should fall and that, therefore, the provision of P.A. 12-5 requiring prospective application is severable.

### III

### CONCLUSION

The effective date provision of P.A. 12-5 is patently unconstitutional under the federal constitutional ban on cruel and unusual punishment. Moreover, our state constitution's prohibition of excessive and disproportionate punishment renders capital punishment unconstitutional. If our state had executed one person while the prospective repeal is in effect, it would have separated itself from not only all of the states in our own country, but from all of the countries in the modern world. Instead of continuing its tradition as a paradigm for the elimination of the death penalty for certain classes of individuals, Connecticut would have descended into the murky depths of the uncharted waters of death penalty executions postrepeal of the death penalty statute. The majority's decision today derives from the strength of our collective moral ethos. Our laws should never succumb to the inherent indecency associated with a vengeful purpose directed toward a few isolated individuals. I do not believe that this is the legacy which Connecticut wishes to leave to its future generations.

Therefore, I respectfully join in the majority opinion and issue this concurring opinion.

[1] The eighth amendment to the United States constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The cruel and unusual punishments clause of the eighth amendment is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See *State* v. *Taylor G.*, 315 Conn. 734, 737 n.4, 110 A.3d 338 (2015).

Article first, § 8, of the constitution of Connecticut provides in relevant part that in all criminal prosecutions: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ." Article first, § 9, of the constitution of Connecticut provides in relevant part: "No person shall be . . . punished, except in cases clearly warranted by law." This court has previously held that these provisions of our state constitution "impliedly prohibit punishment that is cruel and unusual." *State* v. *Rizzo*,

303 Conn. 71, 130 n.52, 31 A.3d 1094 (2011), cert. denied, U.S. , 133 S. Ct. 133, 184 L. Ed. 2d 64 (2012); see also *State* v. *Ross*, 230 Conn. 183, 246–47, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995).

[2] Connecticut has previously acted ahead of the United States Supreme Court and other states in this nation in prohibiting the execution of mentally handicapped individuals; see Public Acts 2001, No. 01-151, § 2; minors; see Public Acts 1973, No. 73-137, § 4 (f); and perpetrators of nonhomicide offenses. See Public Act 73-137, § 3; Public Acts 2001, No. 01-151, § 3; see also *State* v. *Rizzo*, 303 Conn. 71, 189, 31 A.3d 1094 (2011) (noting that Connecticut had acted to ban these practices ahead of United States Supreme Court, and stating, "over time, the national landscape has become more closely aligned with Connecticut"), cert. denied, U.S. , 133 S. Ct. 133, 184 L. Ed. 2d 64 (2012).

[3] I note that neither the majority nor the dissents in *Atkins* focused their analysis on the legislative history of the repeal statutes referenced therein. See *Atkins* v. *Virginia*, supra, 536 U.S. 313–17; id., 321–23 (Rehnquist, C. J., dissenting); id., 342–45 (Scalia, J., dissenting). Thus, it appears that when examining whether a national consensus against a particular sentencing practice has emerged for eighth amendment purposes, the relevant inquiry does not appear to focus on *why* a statute repealing a particular sentencing practice was passed, but *whether such legislation was passed at all*. Further, the fact that the issue in *Atkins* was whether it was considered cruel and unusual to sentence a particular subset of criminal defendants who were less culpable than a typical capital defendant does not affect the relevance of that analysis to the present case. The majority in *Atkins* provided courts with a rosetta stone for use in deciphering whether a national consensus exists against a particular sentencing practice—whatever it may be. Using *Atkins* and its sister cases as an indicator of the sources that the United States Supreme Court has looked to when it has sought to determine whether a national consensus against a particular sentencing practice exists is entirely relevant to the present case. In this respect, the present case is indistinguishable from *Atkins*. In *Atkins*, it was no mere oversight or accident that the majority's approach to determining the existence of a national consensus differed from the approach adopted in Justice Scalia's dissent. Indeed, Justice Scalia spent paragraphs castigating the majority in *Atkins* for its approach, some of which I quote here: "The [c]ourt pays lipservice to these precedents as it miraculously extracts a 'national consensus' forbidding execution of the mentally retarded . . . from the fact that [eighteen] [s]tates—less than half (47 [percent]) of the [thirty-eight] [s]tates that permit capital punishment (for whom the issue exists)—have very recently enacted legislation barring execution of the mentally retarded. Even that 47 [percent] figure is a distorted one. *If one is to say, as the [c]ourt does today, that all executions of the mentally retarded are so morally repugnant as to violate our national 'standards of decency,' surely the 'consensus' it points to must be one that has set its righteous face against all such executions. Not [eighteen] [s]tates, but only [seven]—18 [percent] of death penalty jurisdictions—have legislation of that scope.* Eleven of those that the [c]ourt counts enacted statutes prohibiting execution of mentally retarded defendants convicted after, or convicted of crimes committed after, the effective date of the legislation; those already on death row, or consigned there before the statute's effective date, or even (in those [s]tates using the date of the crime as the criterion of retroactivity) tried in the future for murders committed many years ago, could be put to death. *That is not a statement of absolute moral repugnance, but one of current preference between two tolerable approaches.* Two of these [s]tates permit execution of the mentally retarded in other situations as well: Kansas apparently permits execution of all except the severely mentally retarded; New York permits execution of the mentally retarded who commit murder in a correctional facility." (Citation omitted; emphasis altered; footnotes omitted.) Id., 342–43.

Six justices read those words by Justice Scalia and disagreed, finding that a national consensus against the sentencing practice at issue in *Atkins* and making that conclusion in part because of those states that had instituted prospective only repeals. An examination of subsequent cases decided by the United States Supreme Court on similar issues only serves to reinforce this point. See, e.g., *Graham* v. *Florida*, supra, 560 U.S. 62–63 (examining legislation to determine whether national consensus against sentencing practice exists, no indication that whether repeal is prospective or total is relevant to analysis).

[4] See generally Death Penalty Information Center, "Executions in the U.S.

1608–2002: The ESPY File, Executions by State," available at http://www.deathpenaltyinfo.org/documents/ESPYstate.pdf (last visited August 10, 2015); Death Penalty Information Center, "States With and Without the Death Penalty," (2015), available at http://www.deathpenaltyinfo.org/states-and-without-death-penalty (last visited August 10, 2015); footnotes 16 through 28 of this opinion.

[5] See 1957 Hw. Sess. Laws 314; 2010 Ill. Laws 7778; 1965 Iowa Acts 827; 1887 Me. Laws 104; 2013 Md. Laws 2298; 1911 Minn. Laws 572; 2007 N.J. Laws 1427; 2009 N.M. Laws 141; 1965 Vt. Acts & Resolves 28; 1853 Wis. Sess. Laws 100; Death Penalty Information Center, "Michigan," (2015), available at http://www.deathpenaltyinfo.org/michigan-0 (last visited August 10, 2015).

[6] New Mexico prospectively repealed the death penalty for crimes committed on or after July 1, 2009. See 2009 N.M. Laws 141. Governor Bill Richardson declined to commute the death sentences of the two prerepeal defendants. The New Mexico Supreme Court also allowed a death penalty trial for another defendant charged with a capital felony to go forward after the prospective repeal took effect, but that court specifically acknowledged that its decision had not reached the issue of the legality of the prospective repeal: "With regard to the issue addressed in briefing and in argument but not raised in the [p]etition, whether [the prospective repeal of the death penalty] prohibits the imposition of the death penalty in this case as a matter of law because [the defendant] was not sentenced prior to the effective date of [the repeal], *this [c]ourt determines it inappropriate to decide the issue in this writ proceeding and expressly does not do so* . . . ." (Emphasis added.) *Astorga* v. *Candelaria*, Supreme Court of New Mexico, Docket No. 33, 152 (September 1, 2011). Notably, however, the New Mexico Supreme Court did allow that defendant to make an argument at his sentencing regarding "what consideration, if any, jurors may deem appropriate to give to the fact that New Mexico has repealed the death penalty for offenses committed after July 1, 2009," in making their determination whether to sentence the defendant to death or life imprisonment. Id. The defendant's penalty phase of the trial ended in a jury deadlock, and the judge therefore sentenced the defendant to life imprisonment in accordance with New Mexico law. See *State* v. *Astorga*, 343 P.3d 1245, 1249 (N.M. 2015).

[7] It is true that this court has previously refused to apply retroactively other amendments to the statutory capital sentencing scheme then in effect. See *Dortch* v. *State*, 142 Conn. 18, 28–30, 110 A.2d 471 (1954) (finding that legislature clearly intended for savings statute to apply to legislation changing punishment for first degree murder conviction from mandatory death sentence to sentence of either life imprisonment without possibility of release or death depending on recommendation of jury, no violation of equal protection to do so); *Simborski* v. *Wheeler*, 121 Conn. 195, 198–201, 183 A. 688 (1936) (finding that legislature clearly intended for savings statute to apply to legislation altering mode of execution from hanging to electrocution, rendering alteration prospective only in nature). Neither of these cases, however, involved a challenge to the prospective only nature of the legislation at issue based on the eighth amendment to the constitution of the United States. Indeed, both *Dortch* and *Simborski* were decided well before the United States Supreme Court issued its opinions in *Furman* v. *Georgia*, supra, 408 U.S. 238, and *Gregg* v. *Georgia*, supra, 428 U.S. 153, the two cases which serve as the foundation of modern death penalty jurisprudence. I seriously doubt that our decision in either *Dortch* or *Simborski* would comport with our modern understanding of the cruel and unusual punishment clause of the eighth amendment and, thus, I do not consider these opinions to hold any precedential value on this point.

[8] *Cooper* was decided prior to the United States Supreme Court's decision in *Roper* v. *Simmons*, supra, 543 U.S. 551, which concluded that it violates the federal constitution to execute defendants who had committed their crime prior to the age of eighteen. Id., 568–71.

[9] *Van Tran* v. *State*, supra, 66 S.W.3d 790, and *Fleming* v. *Zant*, supra, 259 Ga. 687, were decided prior to *Atkins* v. *Virginia*, supra, 536 U.S. 321, wherein the United States Supreme Court concluded that executing mentally disabled individuals constitutes cruel and unusual punishment in violation of the eighth amendment to the United States constitution.

[10] Furthermore, to the extent that these decisions from our sister states do support the proposition that legislation prospectively repealing the death penalty for defendants with specific characteristics that reduce culpability must also apply to that class of offenders who committed their crimes prior to the effective date of the legislation, this proposition supports the principle that similarly culpable defendants deserve similar punishment. See part I

A 2 and part I A 3 of this concurring opinion.

[11] The United States Supreme Court has stated that the eighth amendment demands reliability and consistency in the imposition of the death penalty in order for a capital sentencing scheme to pass constitutional muster. See *Furman* v. *Georgia*, supra, 408 U.S. 309–10 (Stewart J., concurring). The question is not one involving rational basis review. The United States Supreme Court has invalidated modern capital sentencing schemes even though one could argue that the schemes were rationally related to a valid legislative purpose. For example, in *Woodson* v. *North Carolina*, 428 U.S. 280, 286, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) (plurality opinion), the court invalidated a statutory scheme that imposed a mandatory death sentence if an offender were convicted of first degree murder. The court made this ruling in part because the statute's "failure to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death. . . . A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind." (Citations omitted.) Id., 303–304. The court continued: "While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the [e]ighth [a]mendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." (Citation omitted.) Id., 304; cf. *Callins* v. *Collins*, 510 U.S. 1141, 1144, 114 S. Ct. 1127, 127 L. Ed. 2d 435 (1994) (Blackmun, J., dissenting from denial of certiorari) ("[r]easonable consistency [in imposing the death penalty] requires that the death penalty be inflicted evenhandedly, *in accordance with reason and objective standards*, rather than by whim" [emphasis added]).

[12] I extend my thanks to the amicus curiae Legal Historians and Scholars for bringing much of the following information to my attention.

[13] North Dakota's repeal was enacted in 1915, while West Virginia's repeal was enacted in 1965. See 1915 N.D. Laws 76; 1965 W. Va. Acts 207; J. Galliher et al., "Abolition and Reinstatement of Capital Punishment During the Progressive Era and Early 20th Century," 83 J. Crim. L. & Criminology 538, 555–56 (1992); see also Death Penalty Information Center, "Executions in the U.S. 1608–2002: The ESPY File, Executions by State," pp. 210, 402, available at http://www.deathpenaltyinfo.org/documents/ESPYstate.pdf (last visited August 10, 2015).

In some other states, although the legislation did not contain language expressly applying the repeal retroactively, the legislation was arguably retroactive in that the statutes provided, generally, that "the punishment of death is hereby abolished." 1852 R.I. Pub. Laws 12; see also 1957 Alaska Sess. Laws 262.

[14] See Editorial, "Quinn Will Commute Death Term," Honolulu Advertiser, March 26, 1958, p. A1; Editorial, "Justice Advances in Illinois," N.Y. Times, March 10, 2011, p. A30; G. Mills, "Death Order Is Commuted to Life Term," Des Moines Register, January 10, 1965, p. 1L; J. Wagner, "On last full day, O'Malley issues orders commuting four death-row sentences," Washington Post, January 20, 2015, available at http://www.washingtonpost.com/local/md-politics/on-last-full-day-omalley-issues-orders-commuting-four-death-row-sentences/2015/01/20/0d22c2f4-a10f-11e4-b146-577832eafcb4_story.html (last visited August 10, 2015); J. Bessler, Legacy of Violence: Lynch Mobs and Executions in Minnesota (2003) p. 179; J. Peters, "Corzine Signs Bill Ending Executions, Then Commutes Sentences of 8," N.Y. Times, December 18, 2007, p. B3; see also Death Penalty Information Center, "Executions in the U.S. 1608–2002: The ESPY File, Executions by State," pp. 103, 105, 166, 168, 221, available at http://www.deathpenaltyinfo.org/documents/ESPYstate.pdf (last visited August 10, 2015).

[15] *United States* v. *Lee*, 489 F.2d 1242, 1246–47 (D.C. Cir. 1973); *Commonwealth* v. *Colon-Cruz*, 393 Mass. 150, 163–72, 470 N.E.2d 116 (1984); *People* v. *Taylor*, 9 N.Y.3d 129, 155, 878 N.E.2d 969, 848 N.Y.S.2d 554 (2007); see also Death Penalty Information Center, "Executions in the U.S. 1608–2002: The ESPY File, Executions by State," pp. 65, 158, 255, available at http://www.deathpenaltyinfo.org/documents/ESPYstate.pdf (last visited August 10, 2015).

[16] 1917 Ariz. Sess. Laws 4 (repeal); 1919 Ariz. Sess. Laws 18 (reinstatement);

see also Death Penalty Information Center, "Executions in the U.S. 1608–2002: The ESPY File, Executions by State," p. 35 (indicating no executions took place during period of repeal), available at http://www.deathpenaltyinfo.org/documents/ESPYstate.pdf (last visited August 10, 2015).

[17] 1897 Colo. Sess. Laws 135 (repeal); 1901 Colo. Sess. Laws 153 (reinstatement); Office of the Colorado State Public Defender, "Catalog of Colorado Executions," (2009), available at http://pdweb.coloradodefenders.us/index.php?option=com_content&view=article&id=152&ltemid=108 (last visited August 10, 2015) (indicating no executions between repeal of the death penalty on March 29, 1897, and reinstatement of death penalty on May 2, 1901); see also Death Penalty Information Center, "Executions in the U.S. 1608–2002: The ESPY File, Executions by State," p. 57, available at http://www.deathpenaltyinfo.org/documents/ESPYstate.pdf (last visited August 10, 2015).

[18] 51 Del. Laws 742 (1957) (repeal); 53 Del. Laws 801 (1961) (reinstatement); Delaware Dept. of Corrections, "Death Row," (2015), available at http://www.doc.delaware.gov/deathrow/history.shtml (last visited August 10, 2015) (indicating no executions between repeal of death penalty on April 2, 1958, and reinstatement of death penalty on December 18, 1961); see also Death Penalty Information Center, "Executions in the U.S. 1608–2002: The ESPY File, Executions by State," p. 66, available at http://www.deathpenalty info.org/documents/ESPYstate.pdf (last visited August 10, 2015).

[19] 1872 Iowa Acts 139 (repeal); 1878 Iowa Acts 150–51 (reinstatement); D. Haws, Iowa and the Death Penalty: A Troubled Relationship (2010) pp. 289, 298 (indicating no executions following repeal); see also Death Penalty Information Center, "Executions in the U.S. 1608–2002: The ESPY File, Executions by State," p. 104, available at http://www.deathpenaltyinfo.org/documents/ESPYstate.pdf (last visited August 10, 2015).

[20] 1907 Kan. Sess. Laws 299 (repeal); 1935 Kan. Sess. Laws 234 (reinstatement); see also Death Penalty Information Center, "Executions in the U.S. 1608–2002: The ESPY File, Executions by State," p. 119, available at http://www.deathpenaltyinfo.org/documents/ESPYstate.pdf (last visited August 10, 2015). We note that the United States government carried out an execution in 1930 at the federal penitentiary located in Leavenworth, Kansas. See Federal Bureau of Prisons, "Capital Punishment," (2015), available at http://www.bop.gov/about/history/federal_executions.jsp (last visited August 10, 2015); see also Death Penalty Information Center, "Federal Executions 1927–2003," (2014), available at http://www.deathpenaltyinfo.org/federal-executions-1927-2003 (last visited August 10, 2015). Obviously, this execution was for a violation of federal law.

[21] 1876 Me. Laws 81 (repeal); 1883 Me. Laws 169 (reinstatement); D. Hearn, Legal Executions in New England: A Comprehensive Reference, 1623–1960 (1999), pp. 255–57 (listing executions, indicating none occurring in Maine following repeal); see also Death Penalty Information Center, "Executions in the U.S. 1608–2002: The ESPY File, Executions by State," p. 166, available at http://www.deathpenaltyinfo.org/documents/ESPYstate.pdf (last visited August 10, 2015).

[22] 1917 Mo. Laws 246 (repeal); 1919 Mo. Laws 778 (reinstatement); H. Frazier, Death Sentences in Missouri, 1803-2005: A History and Comprehensive Registry of Legal Executions, Pardons, and Commutations (2006), p. 209 (indicating no executions during period of repeal); see also Death Penalty Information Center, "Executions in the U.S. 1608–2002: The ESPY File, Executions by State," p. 174, available at http://www.deathpenaltyinfo.org/documents/ESPYstate.pdf (last visited August 10, 2015).

[23] 1969 N.M. Laws 415 (repeal); 1979 N.M. Laws 522 (reinstatement); see also Death Penalty Information Center, "Executions in the U.S. 1608–2002: The ESPY File, Executions by State," p. 223 (indicating no executions during period of repeal), available at http://www.deathpenaltyinfo.org/documents/ESPYstate.pdf (last visited August 10, 2015).

[24] 1965 N.Y. Laws vol. I, 1021–22 (partial repeal of death penalty); 1995 N.Y. Laws vol. I, 1 (reinstatement); D. Hearn, Legal Executions in New York State A Comprehensive Reference, 1639-1963 (1997) p. 281–82 (indicating no executions during period of repeal); see also Death Penalty Information Center, "Executions in the U.S. 1608–2002: The ESPY File, Executions by State," p. 255, available at http://www.deathpenaltyinfo.org/documents/ESPYstate.pdf (last visited August 10, 2015).

[25] 1915 Or. Laws 12 (repeal); 1920 Or. Laws 46 (reinstatement); 1965 Or. Laws 6 (repeal); 1978 Or. Laws 4 (reinstatement); Death Penalty Information Center, "Executions in the U.S. 1608–2002: The ESPY File, Executions by State," p. 275 (indicating no executions during period of repeals), available

at http://www.deathpenaltyinfo.org/documents/ESPYstate.pdf (last visited August 10, 2015).

[26] 1915 S.D. Sess. Laws 335 (repeal); 1939 S.D. Sess. Laws 166 (reinstatement); South Dakota Dept. of Corrections, "Frequent Questions: Capital Punishment," (2014), available at http://doc.sd.gov/about/faq/capitolpunish ment.aspx (last visited August 10, 2015) (indicating no executions between repeal in 1915 and reinstatement in 1939); see also Death Penalty Information Center, "Executions in the U.S. 1608–2002: The ESPY File, Executions by State," p. 321, available at http://www.deathpenaltyinfo.org/documents/ ESPYstate.pdf (last visited August 10, 2015).

[27] 1915 Tenn. Pub. Acts 181 (repealing capital punishment for crime of murder); 1919 Tenn. Pub. Acts 5 (reinstating capital punishment for crime of murder); Tennessee Dept. of Corrections, "Tennessee Executions," (2014), available at http://www.tennessee.gov/correction/article/tdoc-tennessee-executions (last visited August 10, 2015) (indicating no executions of offenders convicted of murder between repeal date of March 27, 1915, and reinstatement date of January 30, 1919); see also Death Penalty Information Center, "Executions in the U.S. 1608–2002: The ESPY File, Executions by State," p. 327, available at http://www.deathpenaltyinfo.org/documents/ESPYstate.pdf (last visited August 10, 2015).

[28] See also 1913 Wash. Sess. Laws 581 (repeal); 1919 Wash. Sess. Laws 273 (reinstatement); Washington Dept. of Corrections, "Persons Executed Since 1904 in Washington State," (2014), available at http://www.doc.wa.gov/ offenderinfo/capitalpunishment/executedlist.asp (last visited August 10, 2015) (indicating no executions between repeal date of March 22, 1913, and date of reinstitution on March 14, 1919); see also Death Penalty Information Center, "Executions in the U.S. 1608–2002: The ESPY File, Executions by State," p. 397, available at http://www.deathpenaltyinfo.org/documents/ ESPYstate.pdf (last visited August 10, 2015).

[29] This list includes earlier, temporary repeals in Iowa, Maine, New Mexico, and New York, states that currently have legislation repealing the death penalty. See supra footnotes 19, 21, 23, and 24 of this concurring opinion. Similarly, it includes Tennessee and New York, which temporarily repealed the death penalty only for certain crimes. See footnotes 24 and 27 of this concurring opinion.

[30] The amicus curiae Legal Historians and Scholars note that this occurred in Oregon in 1914; Arizona in 1917; Missouri in 1918; and again in Oregon in 1964. See footnotes 16, 22 and 25 of this concurring opinion.

[31] New Mexico's earlier repeal stated: "Any person currently under penalty of death shall have such penalty revoked, and a penalty of life imprisonment substituted." 1969 N.M. Laws 415.

[32] In Iowa and Maine, for example, the applicable legislation stated that the death penalty was "hereby abolished." 1872 Iowa Acts 139; 1876 Me. Laws 81. Although the legislation did not expressly apply to prerepeal death row inmates, neither state conducted an execution while the repeal was in effect.

[33] I also note that the amicus curiae Experts on International Human Rights and Comparative Law contends that no country has carried out a death sentence while a death penalty repeal was in effect. This information was extracted from reports issued every five years by the United Nations concerning global developments in the law and practice of the death penalty. This court has recognized that the practices of the international community are constitutionally relevant, particularly when international practices do not run counter to relevant case law and practices in this country. See *State* v. *Allen*, 289 Conn. 550, 585, 958 A.2d 1214 (2008). I explore this area further subsequently in part I A 3 of this concurring opinion, but I reiterate here that the lack of postrepeal executions on a global level, coupled with the absence of such executions in this nation, lends further support to my conclusion that there is a consensus against the practice.

[34] The Death Penalty Information Center indicates that, currently, ninety-eight countries have abolished the death penalty for all crimes, while an additional thirty-five countries have either not executed anyone for more than ten years or "have made an international commitment not to use the death penalty." Death Penalty Information Center, "Abolitionist and Retentionist Countries," (2015), available at http://www.deathpenalty info.org/abolitionist-and-retentionist-countries (last visited August 10, 2015). Another seven countries have abolished the use of the death penalty for ordinary crimes. Id.

[35] I question whether, even before the prospective repeal, a sentence of death continued to have any deterrent effect. In his concurring opinion in

*Furman*, Justice White concluded that the death penalty was cruel and unusual as it was then being imposed, but only because the death penalty was imposed so infrequently. See *Furman* v. *Georgia*, supra, 408 U.S. 311 ("I begin with what I consider a near truism: that the death penalty could so seldom be imposed that it would cease to be a credible deterrent or measurably to contribute to any other end of punishment in the criminal justice system"). Justice White went on to explain: "Most important, a major goal of the criminal law—to deter others by punishing the convicted criminal—would not be substantially served where the penalty is so seldom invoked that it ceases to be the credible threat essential to influence the conduct of others. . . . [C]ommon sense and experience tell us that seldom-enforced laws become ineffective measures for controlling human conduct and that the death penalty, unless imposed with sufficient frequency, will make little contribution to deterring those crimes for which it may be exacted." Id., 312. This state has executed one person in the last fifty-five years. See Connecticut State Library, "Executions in Connecticut Since 1894," (last modified May 30, 2013), available at http://www.cslib.org/executions.htm (last visited August 10, 2015). That particular defendant, Michael Ross, withdrew his pending appeals and wrote a letter to Governor M. Jodi Rell requesting that she not intervene. See L. Tuohy, "Ross to Rell: Keep Out of It," Hartford Courant, December 4, 2004, p. B1; L. Tuohy, "Execution Set for May 11," Hartford Courant, February 11, 2005, p. A1. Given the infrequency with which the state carried out executions prior to the repeal of the death penalty, I am not convinced that the carrying out of the executions of the defendants who committed their offenses prior to April 25, 2012, will have any general deterrent effect.

[36] See, e.g., 55 S. Proc., Pt. 2, 2012 Sess., p. 533, remarks of Senator Eric Coleman; 55 S. Proc., Pt. 3, 2012 Sess., pp. 751–52, remarks of Senator Edwin Gomes; 55 S. Proc., Pt. 3, 2012 Sess., p. 784, remarks of Senator Gayle Slossberg; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1257–64, remarks of Representative Gary Holder-Winfield; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1373–74, remarks of Representative Juan Candelaria; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1374–76, remarks of Representative Patricia Dillon.

[37] See, e.g., 55 S. Proc., Pt. 3, 2012 Sess., p. 752, remarks of Senator Edwin Gomes; 55 S. Proc., Pt. 3, 2012 Sess., pp. 781–82, remarks of Senator Edith Prague; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1279–82, remarks of Representative Richard Smith.

[38] See Death Penalty Information Center, "Recent Legislation: Governor's Signature Makes Connecticut Fifth State in Five Years to End Death Penalty," (2015), available at http://www.deathpenaltyinfo.org/recent-legislation-governors-signature-makes-connecticut-fifth-state-five-years-end-death-penalty (last visited August 10, 2015).

[39] See, e.g., 55 S. Proc., Pt. 3, 2012 Sess., p. 673, remarks of Senator Edward Meyer; 55 S. Proc., Pt. 3, 2012 Sess., p. 745, remarks of Senator Terry Gerrantana; 55 S. Proc., Pt. 3, 2012 Sess., p. 751, remarks of Senator Edwin Gomes; 55 S. Proc., Pt. 3, 2012 Sess., p. 769, remarks of Senator Bob Duff; 55 S. Proc., Pt. 3, 2012 Sess., pp. 772–73, remarks of Senator Carlo Leone; 55 S. Proc., Pt. 3, 2012 Sess., pp. 790–91, remarks of Senator Joseph Crisco; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1255–57, remarks of Representative Michael Molgano.

[40] See, e.g., 55 S. Proc., Pt. 3, 2012 Sess., p. 662, remarks of Senator Eric Coleman; 55 S. Proc., Pt. 3, 2012 Sess., pp. 776–77, remarks of Senator Anthony Musto; 55 S. Proc., Pt. 3, 2012 Sess., pp. 782–83, remarks of Senator Gayle Slossberg; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1282–86, remarks of Representative Daniel Rovero; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1340–41, remarks of Representative Philip Miller; 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1352, remarks of Representative John Thompson; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1384–89, remarks of Representative J. Brendan Sharkey.

[41] See, e.g., 55 S. Proc., Pt. 3, 2012 Sess., p. 725, remarks of Senator Robert Kane ("I'm a bit confused by how we are able to make it okay for the existing [eleven] people on death row to be executed but not the future individuals who may commit some of those very same crimes"); Id., p. 747, remarks of Senator Len Suzio ("[i]f you're going to say that taking human life in the form of a legal execution is wrong going forward, then it's wrong going backwards"); 55 H.R. Proc., Pt. 3, 2012 Sess., p. 1040, remarks of Representative Lawrence Cafero ("How can you say in your heart and with your vote that it should no longer be the policy of the state of Connecticut to commit anyone to death? And yet, at the same time, say except for these [eleven] guys. How could you say that? How do you justify that?"); 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1054, remarks of Representative John Hetherington

("It says that, prospectively, it operates to spare killers in the future but not a certain [eleven] who currently occupy death row. So it is a very curious moral position; that is, the morality changes depend upon when it's applied."); 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1307 remarks of Representative Hetherington ("It condemns death going forward, but accepts it in the past. It's illogical; it is arguably immoral."); see also footnote 43 of this opinion.

[42] See, e.g., 55 S. Proc., Pt. 3, 2012 Sess., p. 748, remarks of Senator Len Suzio ("I suspect that one reason why there's this big gaping hole, moral hole in this law is because of the political consequences of making it an absolute both prospectively, as well as retrospectively. And again, that to me is a moral failure. The end does not justify the means, but if [your] position is absolute, if you believe the death penalty is always morally offensive under any and all circumstances going forward then you really have to honor your commitment even to those on death row today.").

[43] I note that, while P.A. 12-5 was being considered by the legislature, eleven people were on death row. On May 22, 2015, Richard Roszkowski was sentenced to death for crimes committed prior to April 25, 2012. See footnote 102 of the majority opinion.

[44] The animus directed toward the two defendants responsible for the high profile crimes in Cheshire, the last of whom was sentenced to death less than three months before the legislature took up P.A. 12-5, is evidenced in a public statement made by Senator Edith Prague: that "[t]hey should bypass the trial and take that second animal and hang him by his penis from a tree out in the middle of Main Street . . . ." B. Connors, "Prague: 'Hang the Animal By His . . . .' " NBC Connecticut (May 12, 2011), available at http://www.nbcconnecticut.com/news/local/Prague-Hang-the-Animal-by-His-121670559.html (last visited August 10, 2015). In *State* v. *Komisarjevsky*, 302 Conn. 162, 179–80, 25 A.3d 613 (2011), this court acknowledged the notoriety of the cases against the two defendants, which aroused such public antipathy as to result in threats against both defense counsel and intimidation of witnesses that had been or might be interviewed by the defense team.

[45] I use the terms "private vengeance" and "revenge" interchangeably throughout this concurrence.

[46] The stark differences between retribution and revenge were not lost on the legislature during the debate of P.A. 12-5. For example, Representative Cafero, a self-proclaimed supporter of capital punishment, aptly outlined the differences between the two, and additionally recognized that only retribution is a valid penological justification for punishment: "A lot of people say that people are for the death penalty because of revenge. If you look up 'revenge' in the dictionary, you'll see it has an emotional component. It is for vengeance. It's within the word vengeance. Vengeance is an emotion. Government does not have the luxury of having emotions, whether that be compassion or vengeance. Government has to seek justice. Justice is the core definition behind retribution." 55 H.R. Proc., Pt. 3, 2012 Sess., pp. 1040–41.

[47] The state also claims that executing prerepeal death row inmates serves a valid penological purpose simply because those defendants chose to murder at a time in which the death penalty was a constitutionally permissible penalty for their conduct, and were sentenced prior to the effective date of the act. I disagree. This claim is merely another reference to deterrence. Moreover, the state's view assumes that the full effect of the death penalty is felt by the defendant at the moment of sentencing. As a practical matter, this is a faulty presumption. In my view, a sentence of death carries two parts: the first is a term of years of imprisonment while the defendant is awaiting execution, and the second is the execution itself. Until a defendant walks into the death chamber to be executed, his sentence is, in all practical respects, life imprisonment without the possibility of parole. Thus, although the prerepeal defendants were sentenced to death under a constitutionally permissible capital sentencing statute, that, by itself, is not a basis to carry out the second aspect of a death sentence, execution.

[48] Although *Gregg* and *Furman* focus on the need to channel the discretion of a sentence in individual cases to avoid arbitrary results, the United States Supreme Court's eighth amendment jurisprudence on arbitrariness in sentencing is not confined to arbitrariness by individual sentencing bodies. See *Woodson* v. *North Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) ("Death, in its finality, differs more from life imprisonment than a [100 year] prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment . . . ."). Moreover, although in *Furman*, the United States Supreme Court's decision focused on the unchanneled discretion being wielded by juries in

individual cases, the court concluded that the death penalty as it was then being imposed was unconstitutional *not* because in any particular instance, the jury's decision was arbitrary, but rather because the capital sentencing schemes of the states *permitted* arbitrary decision making in individual cases. See *Gregg* v. *Georgia*, supra, 428 U.S. 188 ("[b]ecause of the uniqueness of the death penalty, *Furman* held that it could not be imposed under *sentencing procedures* that created a substantial risk that it would be inflicted in an arbitrary and capricious manner" [emphasis added]); *Collins* v. *Collins*, 510 U.S. 1141, 1152–53, 114 S. Ct. 1127, 127 L. Ed. 2d 435 (1994) (Blackmun, J., dissenting from denial of certiorari) ("[i]t is the decision to sentence a defendant to death—not merely the decision to make a defendant eligible for death—that may not be arbitrary").

[49] The state claims that P.A. 12-5 contains no constitutionally invalid provisions because "[i]t is well established that the death penalty does not violate any provision of the federal constitution" and "[l]ikewise, a statute that repeals the death penalty also is constitutionally firm." In my opinion, these arguments have no merit. While it is true that *Gregg* established that the death penalty is not, in and of itself, a violation of any provision of the federal constitution, modern death penalty jurisprudence has made it eminently clear that certain state statutory schemes which impose the death penalty can be unconstitutional either on their face or as applied in a given case. See, e.g., *Penry* v. *Lynaugh*, 492 U.S. 302, 320–28, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) (finding that, although capital sentencing scheme was facially valid, in specific case, scheme prevented jury from considering mitigation evidence presented by defendant), abrogated on other grounds by *Atkins* v. *Virginia*, supra, 536 U.S. 321; *Woodson* v. *North Carolina*, supra, 428 U.S. 301 (rejecting capital scheme that imposed mandatory death penalty for crime of first degree murder in part because statute "depart[ed] markedly from contemporary standards respecting the imposition of the punishment of death and thus cannot be applied consistently with the [e]ighth and [f]ourteenth [a]mendments' requirement that the [s]tate's power to punish 'be exercised within the limits of civilized standards' ").

[50] The state relies on *Seals* v. *Hickey*, 186 Conn. 337, 441 A.2d 604 (1982), and *Beach* v. *Bradstreet*, 85 Conn. 344, 82 A. 1030 (1912), in its argument that the unconstitutional portion of P.A. 12-5 is not severable from the remaining language. I find these cases inapposite to the circumstances in the case at hand. *Seals*, for example, involved a statute which permitted a trial court to deduct from a jury's award of damages any money received by a plaintiff pursuant to a covenant not to sue or release of liability agreement. *Seals* v. *Hickey*, supra, 341 n.6. The court noted that the statute, when the unconstitutional language was excised, "offer[ed] absolutely no direction to the court concerning what steps it may take after the verdict has been returned." Id., 355. In the present case, as I discuss in detail in footnote 52 of this concurring opinion, language can be excised from P.A. 12-5 in such a way so as to render the constitutional remainder entirely workable. Similarly, at issue in *Beach* was the constitutionality of a statute which sought to provide $30 annually to every "resident in the [s]tate who served in the army, navy, marine corps, or revenue marine service of the United States during the Civil War . . . and received an honorable discharge therefrom" or their close family. *Beach* v. *Bradstreet*, supra, 351. The court noted that, as drafted, the law would provide funds not only to those persons who served Connecticut in the Civil War, but also those who had served other states and now happened to reside in Connecticut. Id., 351–52. The court found that it could not sever the statute, in part because the act could not be made constitutional either "by the exclusion or addition of a word or words . . . but only by rewriting the statute." Id., 353. In the statute at hand, the constitutional remainder of the statute can be severed from the unconstitutional portion, solely through the excision of certain language, as I demonstrate in footnote 52 of this concurring opinion. Thus, the circumstances at issue in *Beach* have little bearing on the present case.

[51] It is my position that this court does not examine the legislative history to determine legislative intent if the dominant purpose of the act can be gleaned from its plain meaning. See, e.g., *Cruz* v. *Montanez*, 294 Conn. 357, 370, 984 A.2d 705 (2009) ("[t]he intent of the legislature, as this court has repeatedly observed, is to be found not in what the legislature meant to say, but in the meaning of what it did say"); see also *State* v. *Watson*, 165 Conn. 577, 597, 345 A.2d 532 (1973) ("[i]t is not necessary to find the entire statute invalid since the presumption and the balance of the statute are not so mutually connected and dependent as to indicate a legislative intent that they should stand or fall together"). Reading the plain text of the act, its

dominant purpose is, unassailably, to eliminate the death penalty. If the legislature's dominant purpose was to ensure that the death penalty was to remain in place for capital offenders who committed their crimes prior to April 25, 2012, no change to our old capital scheme was necessary. In footnote 52 of this concurring opinion, I explain in greater detail precisely how to sever the offending portion of P.A. 12-5 from the constitutional remainder.

[52] My conclusion that P.A. 12-5 is severable would not, as the state claims, result in an impermissible rewriting of the act. I would simply read out of the act any references to the effective date of the act, and any references to "capital felonies," which relate solely to capital crimes committed prior to the effective date of the act. For example, § 53a-35a would read as follows: "For any felony committed on or after July 1, 1981, the sentence of imprisonment shall be a definite sentence and, unless the section of the general statutes that defines or provides the penalty for the crime specifically provides otherwise, the term shall be fixed by the court as follows:

"(1) For the class A felony of murder with special circumstances a term of life imprisonment without the possibility of release;

"(2) For the class A felony of murder, a term not less than twenty-five years nor more than life;

"(3) For the class A felony of aggravated sexual assault of a minor under section 53a-70c, a term not less than twenty-five years or more than fifty years;

"(4) For a class A felony other than an offense specified in subdivision (2) or (3) of this section, a term not less than ten years nor more than twenty-five years;

"(5) For the class B felony of manslaughter in the first degree with a firearm under section 53a-55a, a term not less than five years nor more than forty years;

"(6) For a class B felony other than manslaughter in the first degree with a firearm under section 53a-55a, a term not less than one year nor more than twenty years;

"(7) For a class C felony, a term not less than one year nor more than ten years;

"(8) For a class D felony, a term not more than five years;

"(9) For a class E felony, a term not more than three years; and

"(10) For an unclassified felony, a term in accordance with the sentence specified in the section of the general statutes that defines or provides the penalty for the crime."

This approach to severance would not leave a statutory void, as the state claims. The statutory definitions of "capital felony" and "murder with special circumstances" are identical. By severing the language dealing only with "capital felony," the act continues to make illegal the conduct which constituted the definition of "capital felony" but now carries a mandatory sentence of life imprisonment without the possibility of release. See P.A. 12-5, §§ 1, 2. Read in this way, the act applies to all felonies committed after 1981 and, because this revision essentially constitutes a relabeling of the offense of "capital felony" as "murder with special circumstances"; see P.A. 12-5, § 1; no offender currently sentenced to death could claim that he should be released as a result of the elimination of "capital felony"—all such conduct would fall under the umbrella of the definition of "murder with special circumstances," which differs from "capital felony" only with regard to the sentence that might be imposed. See P.A. 12-5, § 2. The only relief that an offender currently sentenced to death could hope for, if the statute were severed according to this approach, would be to be resentenced to life imprisonment without the possibility of release. As in *Bell*, the defendant and other prerepeal death row inmates would have no claim that the offense of "murder with special circumstances" does not apply to them through the workings of the ex post facto clause, because it does not disadvantage the defendant in any way—the effect of this revision would solely be ameliorative from a defendant's perspective, in that it prevents the imposition of a sentence of death. Cf. *State* v. *Bell*, supra, 303 Conn. 256–58 (noting that ex post facto clause applies to judicial gloss applied to statutes when such law [1] would have retroactive effect and [2] would operate in such way that would be unforeseeable and disadvantageous to criminal defendant; finding change to be ameliorative and procedural and, thus, not in violation of ex post facto clause). There would also be no need to retry the defendant, as all the predicate factual findings for convicting the defendant of "murder with special circumstances" would be satisfied by the jury's verdict in the guilt phase of the defendant's earlier capital trial. See P.A. 12-5, § 1.

Further, this approach would not require further action in amending any other statutes—by striking all references to the effective date provision and "capital felony" in the act itself, the change would affect all relevant statutes. This method of revision would not strike any reference to "murder with special circumstances" and thus would have no impact on the function of the legislature's chosen sentencing scheme for serious felonies committed today or in the future.

[53] Specifically, the state points to comments of several representatives and senators who suggested that, politically speaking, P.A. 12-5 could be passed only if the repeal were prospective in nature. I observe first that, for purposes of a severability analysis, this court does not immediately look to the legislative history for guidance. See footnote 51 of this concurring opinion. Second, as I describe in detail, these selected statements do not come close to telling the whole story about the nature of this debate and the actions of the legislature. Both the House and Senate voted down proposed amendments that would have expressly required the act to be struck down in its entirety if this court were to conclude that the prospective only nature of the repeal violated either the federal or state constitution. See 55 S. Proc., Pt. 3, 2012 Sess., p. 669; 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1066. The legislature decided against these proposed amendments in the face of testimony that warned of the likelihood that the prospective only nature of the repeal was likely to be found unconstitutional. See, e.g., Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., p. 2635, remarks of Chief State's Attorney Kevin Kane.

[54] Pressed further on the issue, Chief State's Attorney Kane stated: "My prediction is that the arguments that I have so far, that we have discussed in thought I don't think are likely to prevail in the Supreme Court given . . . the prior language and several prior opinions about the death penalty. *And I don't think anybody should be deluding themselves that it's likely that this can be prospective.* I think that would be—prospective only. I think that would be a big mistake." (Emphasis added.) Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., p. 2635.